**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 16-133 (KBJ) |
| | ) | |
| WALTER J. CRUMMY. | ) | |
| ———————————————— | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Defendant, Walter J. Crummy, by and through the undersigned counsel, respectfully

submits this memorandum in aid of sentencing. Walt Crummy pled guilty earlier this year to one

count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, for his limited role in

a conspiracy to improperly obtain two government set-aside contracts. He is scheduled to be

sentenced on January 12, 2017. Based on Walt's role in the offense, his early cooperation and

plea, and the otherwise unassailable life he has led, a sentence to a term of probation and

forfeiture in the amount of $105,618 would be sufficient, but not greater than necessary, to

satisfy the sentencing factors set forth in 18 U.S.C. § 3553(a). In the event the Court accepts the

Probation Office's Guideline calculation, Mr. Crummy respectfully submits that a variance from

the Guidelines would be entirely appropriate and consistent with the approach taken in similar

cases.

## I.  INTRODUCTION

Walt Crummy made a terrible choice that is truly an anomaly in an otherwise good and

decent life. He has accepted responsibility for his crime and comes before the Court asking that

his misconduct be judged not in isolation, but against the backdrop of his entire life. Sentencing

presents the Court with an opportunity to do just that, to evaluate not only Walt's crime, but also

Walt's significant contributions to his family and society, and then to consider all the sentencing

factors in imposing a sentence that is both just and compassionate. Walt's is precisely the type

of case in which a defendant's otherwise unblemished personal history and characteristics, combined with the circumstances of the offense, calls for a non-incarcerative sentence.

Walt's friends and family have written many letters detailing who Walt Crummy is—a man defined by his faith and devotion to serving others. Those who know him best describe a man who leads not only a good and law-abiding life, but one where he actively contributes to his church and his community. Walt is a devoted husband and father of two adopted children. He is a grandfather who takes care of his grandchildren, one of whom is disabled. He is a lifelong church and community volunteer who participates, without hesitation, when others are in need. Walt did not commence his good deeds only after being contacted by law enforcement. He has a lifetime of good behavior behind him, interrupted only by the instant offense for which he has accepted responsibility. Walt's background is in part what led him to accept responsibility for his actions and cooperate early with the Government, by meeting with the Government and entering into an early plea agreement. Walt pled to a very detailed Information, which allowed the Government to conserve resources by avoiding any litigation and which likely contributed to the Government's ability to secure guilty pleas from other defendants.

Walt's life as described by his friends and family has not been without challenges. He suffers from his own health issues, including a cancer diagnosis which has worsened recently. Now, as a result of his involvement in the MCC Construction Company ("MCC") scheme, he has lost his career, his CPA license, and his job, in addition to paying the government over $330,000 in connection with both his own and MCC's plea agreements. In the wake of *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), this Court can, and should, exercise its discretion and flexibility and impose a sentence of probation. Such a sentence, in addition to all of the

2

attendant personal and economic consequences of Walt's guilty plea noted herein, would reflect the seriousness of Walt's actions and adequately punish him for his criminal conduct. This Sentencing Memorandum seeks to demonstrate why.

## II.     THE CORRECT GUIDELINES RANGE IS 0-6 MONTHS

As is often the case in fraud sentences, the recommended advisory Guidelines range is almost entirely driven by the loss amount. Here, the Presentence Investigation Report ("PSR") calculates a total offense level of 19. PSR ¶¶ 71, 74, ECF. No. 12.[1] The PSR calculates that offense level after including a 16-level enhancement under U.S.S.G. § 2B1.1(b) based on the purported loss, a 2-level downward adjustment for Walt's early acceptance of responsibility and a 1-level downward adjustment for his assistance to the Government in the investigation and prosecution of his conduct. PSR ¶¶ 62-71. This calculation misstates the appropriate offense level because it is based on an incorrect calculation of the "loss" under U.S.S.G. § 2B1.1(b). When that error is corrected, the proper loss amount attributable to the offense of conviction is zero, not $1,631,377. The PSR also erred by not making a 2-level downward adjustment for Walt's minor role in the offense,[2] particularly relative to the two other defendants who pled guilty.[3] Therefore, the proper offense level is two, resulting in a sentencing range of zero to six

---

[1] The Probation Office's finding that the plea agreement included an erroneous fine range is correct, and this Court should look to the 2014 Sentencing Guidelines fine table should the Court decide that a fine is appropriate in this case. *See* PSR ¶¶ 10 n.2-3, 141.

[2] Should the Court accept that this is a no-loss case, both an offense level of 2 and 4 correspond to a sentence of 0-6 months under the Guidelines.

[3] The Court should also consider Walt's early cooperation and entry of his guilty plea. As a result of his limited role in the offense conduct, Walt's cooperation did not merit a downward departure pursuant to U.S.S.G. § 5K1.1. Nevertheless, his cooperation and early guilty plea, as demonstrated by the very detailed Information to which Mr. Crummy pled, contributed to the

months' incarceration.  An offense level of 2 places Walt in Zone A of the Sentencing Table, which authorizes a sentence of probation,[4] with no conditions such as home confinement required.  *See* U.S.S.G. § 5B1.1(a)(1).

### A.        There Is No Loss Amount Attributable to Walt Crummy's Offense.

For the purposes of calculating Walt's "Specific Offense Characteristics," the PSR suggests a loss amount of $1,631,377.  PSR ¶¶ 49, 63.  This loss amount is incorrect.  This purported loss represents the total value of the two Coast Guard contracts at issue in Walt's guilty plea, without considering the valuable construction services provided to the Government. U.S.S.G. § 2B1.1 Application Note 3(E), states that "[l]oss shall be reduced by the following: (i) the money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."  The loss amount in the PSR should be reduced by the value of the services provided to the Government, which results in a loss amount of zero.

The conduct at issue in Walt's plea agreement encompasses two subcontracts that MCC had with Far East Construction ("Far East"), a small business.  The "Coast Guard – North" contract was awarded to Far East in August 2010 and the "Coast Guard – South" contract was awarded to Far East in February 2011.  PSR ¶ 49.  The Government acknowledges that both of these contracts resulted in an actual loss to MCC.  *See id.* ¶ 51.  Under both contracts, the

---

Government's ability to secure guilty pleas from other defendants.  *See* Department of Justice, U.S. Attorney's Manual 9-27.420(B)(11).

[4] The offense of conviction is neither a Class A or B felony, so probation is an appropriate sentence.  *See* 18 U.S.C § 3559(a) and U.S.S.G. § 5B1.1(b).

Government received the benefits of its bargain; namely, the Government received construction services at a fair market price. There has been no suggestion that the work performed by MCC was anything but the highest quality. Accordingly, the Coast Guard suffered no pecuniary loss as a result of MCC performing more of the work on these two contracts than was permitted.

Although there are no appellate opinions on point from the D.C. Circuit, three other Circuit courts have issued opinions agreeing that the correct loss calculation is the value of the contracts at issue less the fair market value of the services provided to the Government.

The most recent Federal Court of Appeals to rule on this issue was the Fifth Circuit in *United States v. Harris*, 821 F.3d 589 (5th Cir. 2016). *Harris* involved two federal contracts set-aside for small businesses under the Small Business Administration's ("SBA") 8(a) program. *Id.* at 591. The Fifth Circuit in *Harris* rejected the Government's position that the loss was the total value of the contracts because the contracts, awarded under the SBA 8(a) set-aside program, were subject to the "Government Benefits" rule. *See* U.S.S.G. § 2B1.1 cmt. n.3(F)(ii). The court held that "[t]he mere fact that a government contract furthers some public policy objective apart from the government's procurement needs is not enough to transform the contract into a 'government benefit' akin to a grant or an entitlement program payment." *Harris*, 829 F. 3d at 604. Instead, the loss analysis is "properly rooted in the general loss calculation rule," and thus "the loss amount should have reflected not the total contract price, but rather the contract price less the fair market value of services rendered." *Id.* at 604-65. This "'realistic, economic approach'" should reflect "only the difference between the contract price and [the defendant's] costs." *Id.* at 607. The court based its rationale on a plain reading of the "Government Benefits Rule," stating:

While a government contract awarded under an affirmative action program may be, in some sense, a "benefit" to the company awarded the contract, it does not share the common features of grants, loans, and entitlement program payments. Unlike the three enumerated examples, a contract award is not a unilateral transfer, but rather a bargained-for exchange for services rendered. ***And unlike the enumerated examples, contracts awarded under the 8(a) program do not exist primarily to benefit the awardee; rather, such contracts first and foremost serve the government's own procurement needs.***

*Id.* at 603 (emphasis added).

The *Harris* court discussed other Circuit decisions that adopted a similar rationale. In *United States v. Nagle*, the Third Circuit also held that loss in a small business government contracts fraud case is the net loss, "taking the face value of the contracts and subtracting the fair market value of the services rendered under those contracts." 803 F.3d 167, 183 (3d Cir. 2015), *cert. denied*, 136 S. Ct 1238 (2016). The Third Circuit vacated the sentences of two co-owners of an ineligible company who conspired to use a minority-owned front company to win $136 million in set-aside construction contracts. Notably, the Third Circuit found that the "Government Benefits Rule" did apply, but held that Application Note 3(E)(i) still required an offset for the services provided, because, unlike Application Note 3(F)(v) which explicitly excludes offsets for the value of the services rendered, the "Government Benefits Rule" has no such language. *Id.* at 182. The Third Circuit thus found that the district court had improperly calculated the loss by failing to subtract from the total value of the contracts the value of the work performed on the contracts, including the cost of materials and labor. *Id.* at 183.

The Ninth Circuit has reached a similar result. In *United States v. Martin*, the court held that, in cases involving disadvantaged business set-aside contracts, courts must subtract from the price of the contract the value of the services rendered to the government. 796 F.3d 1101, 1110

(9th Cir. 2015) ("It would be unjust to set the loss resulting from [the defendant's] fraud as the entire value of the contracts" where the defendant fully performed the contracts).

Applying the rationale from the Fifth, Third, and Ninth Circuits to the case at hand, there is no loss to the Government under U.S.S.G. § 2B1.1. The difference between the contract value and the fair market value, measured as the difference between the contract price and MCC's costs, is conceded by the Government in the Statement of Offense to be zero because MCC lost money on both contracts. Thus, the loss amount should be zero, and no increase to Mr. Crummy's base offense level is warranted.[5]

We note that while other Circuit courts have applied the "Government Benefits Rule" to small business government contracts cases, we submit that the cases above from the Fifth, Third, and Ninth Circuits are more persuasive and should be followed here.[6] These other cases were discussed at length in *United States v. Singh*, No. CR 15-173 (RBW), 2016 WL 3443906 (D.D.C. June 17, 2016). Although the court in *Singh* disagreed with *Harris* and applied the "Government Benefits Rule" in a case involving small business government contracting, its rationale was

_____

[5] This Court should avoid the temptation to apply the Government's forfeiture calculation as a substitute for loss because it overstates Mr. Crummy's personal gain from this scheme. *See United States v. Hein*, 395 F. App'x 652, 658 (11th Cir. 2010) ("The Court has noted the similarities between forfeiture and loss but has held district courts must calculate each one distinctly as part of its calculations used for sentencing."); *United States v. Andradi,* 309 F. App'x 891, 893 (5th Cir. 2009) ("our court has previously recognized that the loss-amount and forfeiture-amount calculations are conceptually-distinct inquiries"). The Government derived Walt's forfeiture by calculating the ratio of *all* of MCC's Far East-related revenue to MCC's overall revenues from 2008 to 2012, and applying that percentage to Walt's salary and bonus for 2010 to 2012. *See* PSR ¶¶ 50-53. The Government's forfeiture calculation overstates Walt's share of both the profits and revenues flowing from his offense conduct.
[6] *See United States v. Blanchet*, 518 F. App'x 932, 956–57 (11th Cir. 2013); *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006); *United States v. Bros. Constr. Co.*, 219 F.3d 300 (4th Cir. 2000).

based on a misapplication of a provision of the Small Business Jobs Act, 15 U.S.C. § 632(w). Importantly, *Singh* is the only case where a court has applied § 632(w) to a sentencing determination in the six years since the provision was enacted. This Court should reject the rationale of the *Singh* case and apply the general loss calculation rule here, which would result in a 0-level increase to Walt's Guidelines range.

In *Singh*, the defendant pled guilty to conspiracy to commit major fraud against the United States. 2016 WL 3443906 at *1. There, the defendant set up a new entity to join the Small Business Administration's 8(a) program. *Id.* at *2. The purpose of the new company was so the original company could obtain set-aside work for which it was no longer eligible. *Id.* The defendant then directed his employees to take steps to conceal that fact. *Id.* at *2.[7] The court held that § 632(w) required it to apply the full value of the contracts at issue without any offset for the value of the services performed for the Government. *See id.* at *3-*4. Section 632(w) states:

> In every contract ... which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a presumption of loss to the United States based on the total amount expended on the contract ... whenever it is established that a business concern other than a small business concern willfully sought and received the award ***by misrepresentation***.

15 U.S.C. § 632(w)(1) (emphasis added). Reliance on this provision for sentencing purposes is misplaced for a number of reasons.

---

[7] Unlike the defendant in *Singh* there is no evidence that Mr. Crummy played any role in establishing Far East or soliciting the relationship between Far East and MCC, and the Government has put forth no evidence that Mr. Crummy directed anyone to do anything in furtherance of the scheme at issue in Mr. Crummy's plea agreement.

First, the Coast Guard – North contract was awarded on August 6, 2010, two months prior to the enactment of § 632(w). PSR ¶ 49. The Small Business Jobs Act was signed into law on September 27, 2010, and became effective on that date. The language of § 632(w) is silent as to its *ex post facto* implications. Pub. L. No. 111-240 (Sept. 27, 2010). Therefore, at most, the presumption of loss under § 632(w) would only apply to the Coast Guard – South contract. *See* PSR ¶ 49.

Second, the court in *Singh* failed to address that "misrepresentation" is a specific offense under Title 15, with prescribed penalties. *See* 15 U.S.C. § 645(d) (titled "Misrepresentation, etc."). Congress specifically chose to include only the word "misrepresentation" in the loss presumption under § 632(w)(1), and the *Singh* court erred in reading the presumption more broadly. Mr. Crummy did not plead guilty under 15 U.S.C. § 645(d), and thus the presumption of loss in the Small Business Jobs Act does not apply here.

Third, § 632(w)(1) is not about sentencing at all. The provision does not refer to sentencing or to the Sentencing Guidelines but is instead part of the Small Business Jobs Act's definitions. In the six years that § 632(w)(1) has been law, the Sentencing Commission has not amended the Guidelines in response to § 632(w)(1), and *Singh* is the only case that has even cited § 632(w)(1) in a sentencing decision. Indeed, since at least 2014, in its report to the Sentencing Commission, the Department of Justice asked the Commission to amend U.S.S.G. § 2B1.1, Application Note 3(E) (Credits Against Loss) to carve out an exception for 15 U.S.C. § 632(w), but the Sentencing Commission has not made any such changes. Letter from Department of Justice to Hon. Patti B Saris, U.S. Sentencing Commission, at 10-11 (July 29, 2014); *see also* Letter from Department of Justice to Hon. Patti B Saris, U.S. Sentencing Commission, at 20-22 (July 19, 2016).

Lastly, even if this Court did apply § 632(w) to Mr. Crummy's case, such an application would not require the Court to apply the "Government Benefits Rule." As noted above, nothing in Title 15, including § 632, addresses the Sentencing Guidelines. Application Note 3(E) specifically states that "[l]oss **shall** be reduced" by the value of the services. U.S.S.G. § 2B1.1 cmt. n.3(E) (emphasis added). Even if § 632(w) requires this Court to find that loss is the total value of the contracts, neither the statute nor the implementing regulations addresses whether that loss should be offset by "the fair market value for the property returned and the services rendered" to arrive at the Specific Offense Characteristics enhancements under U.S.S.G. § 2B1.1(b), as specified in Application Note 3(E). *Id.; see also Nagle*, 803 F.3d at 182-83.[8]

Because the court in *Singh* misapplied the "Government Benefits Rule" as a result of its misinterpretation of 15 U.S.C. § 632(w), its rationale should not be followed in this Court's determination of Mr. Crummy's sentence. Instead, this Court should follow the example of the three most recent Circuits to consider this issue, *Harris*, *Nagle*, and *Martin*, and find that the loss under § 2B1.1 here is offset by the fair market value of the services provided to the Government, which would result in an enhancement of zero.

### B.     Walt Crummy Was a Minor Participant.

The PSR's conclusion that Walt does not qualify for a mitigating role adjustment pursuant to U.S.S.G. §3B1.2 is in error. PSR ¶¶ 57, 65. *United States v. Caballero* provides the relevant standard:

---

[8] The court in *Singh* did not fully address this point, and instead it simply disregarded *Nagle* because the Third Circuit did not discuss § 632(w). *Singh*, 2016 WL 3443906 at *5. The court in *Singh* also disregarded *Nagle* because the contracts at issue in *Nagle* did not involve the SBA, but under that rationale the court should have also disregarded *Leahy* and *Brothers Construction*, which also involved state programs and not the SBA. *See id.* at *3, *5.

Before it may find that a defendant was a minor participant in the offense, however, the evidence available to the court at sentencing must, at a minimum, show (i) that the "relevant conduct" for which the defendant would, within the meaning of section 1B1.3(a)(1), be otherwise accountable involved more than one participant (as defined in section 3B1.1, comment. (n.1)) and (ii) that the defendant's culpability for such conduct was relatively minor *compared to that of the other participant(s)*. The application of section 3B1.2 is inherently fact-bound and largely committed to the discretion of the trial judge.

936 F.2d 1292, 1299 (D.C. Cir. 1991) (emphasis added). Under this standard and the facts involved here, Walt clearly qualifies for a minor participant adjustment.[9]

Both before and after his awareness of the scheme in December 2009, Walt's role in the relationship between MCC and Far East was appreciably less than the other defendants charged in this case. The PSR notes that Walt "did not play a role in project delivery." PSR ¶ 57. He was even less involved with the operations side of MCC than this statement implies. Walt had no role at MCC with regard to selecting contracting opportunities or drafting proposals to be submitted to the Government by or on behalf of MCC, Far East, or any other entity, except with regard to routine accounting questions from the proposal writing team regarding overhead cost coefficients that would apply to the eventual contract. Unlike other defendants who have pled guilty related to this scheme, Walt was not involved in the selection of the Coast Guard contracts as possible opportunities, he did not participate in the drafting of the proposals for these contracts, he was not involved in staffing decisions or in any other operations related to the performance of the contracts, and he was not responsible for submitting any invoices, certifications, or representations to the Government. Indeed, Walt was expressly told by MCC's

---

[9] The Sentencing Guidelines provide for a minor participant adjustment of -2, a minimal participant adjustment of -4, or an adjustment in between. U.S.S.G. § 3B1.2.

former President that he was not authorized to involve himself in the relationship with Far East, and that he should stick to accounting matters.

The Government's description of Walt's role in one transaction highlights the limited nature of his role in the overall scheme. The Government describes at length a proposal submitted for a contract with the Government Services Administration in Boston. PSR ¶¶ 38-44; Statement of Offense, ECF No. 6. Despite the Government's focus on this transaction in the Statement of Offense, Walt was only peripherally aware of any issues with this proposal and the communications between Far East, MCC, and the Government. In fact, Walt's name only appears in these paragraphs a few times, and these examples only serve to further demonstrate his limited involvement: "Crummy *was not involved* in drafting this proposal for MCC," PSR ¶ 38 (emphasis added), "[a]lthough Mr. Crummy was copied on this email, defendant Crummy *did not play a role* in deciding how MCC should respond to the SBA," *id.* ¶ 41 (emphasis added).

Lastly, following Walt's joining the conspiracy, Far East and MCC entered into only two contracts with the Government, valued at $1,631,377. *Id.* at 49. By contrast, the total scheme involved 27 contracts valued at over $70 million. Walt's activities in furtherance of the scheme involved drafting a document "as instructed by Mr. Harper," and facilitating payments to Far East from the Government due to delays by the Defense Finance and Accounting Services. *Id.* ¶¶ 46-48. Nothing more.

In accordance with this limited role in the conspiracy and particularly with regard to the two Coast Guard contracts at issue here, Walt qualifies for a minor participant adjustment of -2. *See* U.S.S.G. § 3B1.2.

### III.  IF THE COURT ADOPTS THE PSR GUIDELINES CALCULATION, A DOWNWARD VARIANCE AND PROBATION ARE WARRANTED UNDER 18 U.S.C. § 3553(a)

While a variance should be unnecessary here given the zero loss under the Guidelines, should the Court find the loss amount to be greater than zero, a variance would be warranted in this case based on Walt's personal history, good works in his community, family support and obligations, and medical needs.

#### A.  The Guidelines are Advisory.

After *United States v. Booker*, 543 U.S. 220, the Court is not required to impose a Guidelines sentence.  "Under the [Booker] regime, a sentencing court is required 'to consider Guidelines ranges' applicable to the defendant, but is permitted 'to tailor the sentence in light of other statutory concerns as well.'"  *United States v. Adewani*, 467 F.3d 1340, 1341 (D.C. Cir. 2006) (quoting *Booker*, 543 U.S. at 245-46).  A district court may not even "presume that a Guidelines sentence is the correct sentence."  *United States v. Terrell*, 696 F.3d 1257, 1261 (D.C. Cir. 2012) (quoting *United States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007)).  Instead, the court must "evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in [18 U.S.C.] § 3553(a)."  *Id.* (quoting *Pickett*, 475 F.3d at 1353); *see also United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (affirming district court's decision to impose probation and a fine where Guidelines range was 10 to 16 months, observing that the Government's substantive unreasonableness argument "flies in the face of the Supreme Court's precedents [in *Booker* and *Gall*].").

Further, courts have a duty to impose a sentence that is sufficient, but not greater than necessary, to accomplish the purposes of sentencing as set forth in 18 U.S.C § 3553. *Kimbrough*, 552 U.S. at 101 (noting that the objective in sentencing is that it be "sufficient, but

not greater than necessary" to meet the ends of justice). Given the broad substantive discretion afforded to district courts in sentencing, there are "concomitant procedural requirements they must follow." *United States v. Akhigbe*, 642 F.3d 1078, 1084 (D.C. Cir. 2011). Courts begin by calculating the appropriate Guidelines range, which they treat as the starting point and the initial benchmark for sentencing. *Id.*

The Guidelines are of limited value here as a measure of Walt's culpability because they place an "inordinate emphasis . . . on the amount of actual or intended financial loss" in economic crimes without explaining "why it is appropriate to accord such huge weight to [this] factor." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006). Here, a downward variance is necessary, *see Cho*, Plea Agreement at 2 n.1 ("if the Court were to calculate the sentencing guideline in the manner that the government has asked [that is, the full value of the contracts], those cases indicate that substantial downward departures or variances are ordinarily given in cases of this nature"), especially if the Court adopts the Probation Office's loss calculation, which, as discussed *supra*, is in tension with several recent Circuit court opinions.

Finally, as the U.S. Supreme Court established in *Booker*, *Gall*, and *Kimbrough*, a sentencing court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). And in *Gall*, the Supreme Court took pains to point out that 18 U.S.C. § 3553(a)(3) "directs the judge to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59.

## B.     The 3553(a) Factors.

    1.     The governing principles support a downward variance and probationary sentence.

Numerous appellate courts have upheld significant downward variances based on various § 3553(a) factors.  For example, the Eighth Circuit affirmed a district court's decision to downwardly vary from a Guidelines range of 135-168 months imprisonment to probation. *United States v. Cole,* 765 F.3d 884, 885 (8th Cir. 2014).  There, the criminal defendant was convicted for fraud and tax evasion through a scheme that stole approximately $33 million over a four year period.  *Id.*  The sentencing court described the scheme as "one of the largest corporate frauds in Minnesota history."  *Id.* at 886.  Yet the Eighth Circuit upheld the sentence of probation because the defendant "had no prior contact with law enforcement," was not "a consummate fraudster, [or] a pathological liar," and probation would allow the defendant to work and earn money to make restitution.  *Id.*  Notably, the D.C. Circuit will uphold a sentencing variance even if it is based on factors already taken into account by the Guidelines.  *United States v. Ransom,* 756 F.3d 770, 775 (D.C. Cir. 2014).

In *United States v. Sayad*, 589 F.3d 1110 (10th Cir. 2009), a drug trafficking case, the court upheld a probation sentence notwithstanding a Guidelines calculation of 60 months.  The Tenth Circuit affirmed the sentence of five years' probation, which the sentencing court based on the § 3553(a) factors, noting Sayad's "supportive and loving family," the "necessity for [Sayad] to be with his family considering his father's health and their ability to survive, if not prosper, in the very demanding business of running a restaurant," his naiveté and immaturity, his expression of anguish over his criminal conduct, good physical health, his lack of any substance abuse history, and the potential for his rehabilitation outside of imprisonment.  *Id.* at 1114-15.

There are many other appellate decisions that defer to the sentencing courts and affirm downward variances based on § 3553(a) factors. *See, e.g., United States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008) (affirming downward variance from Guidelines range of 18 to 24 months' imprisonment to probation citing defendant's role as a "devoted husband, father, and son," and because defendant made an "isolated mistake" and was "remorseful at sentencing"); *United States v. Baker*, 502 F.3d 465, 469 (6th Cir. 2007) (affirming downward variance from Guidelines range of 27 to 33 months' imprisonment to probation citing defendant's role in caring for his ill son and his remorse); *United States v. Husein*, 478 F.3d 318, 333 (6th Cir. 2007) (affirming a 99.91% variance to probation citing defendant's role assisting with caring for his father); *United States v. Wadena*, 470 F.3d 735, 738 (8th Cir. 2006) (affirming downward variance from a Guidelines range of 18 to 24 months' imprisonment to five years of probation citing defendant's medical condition and the defendant's dependent child).

In addition to the reasons in the cases above, a defendant's good works are a valid basis for a downward variance. *See, e.g.*, *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008). Under *Booker* and its progeny, the Court must consider such good deeds, and is free to apply them at sentencing as it sees fit. An evaluation of Walt Crummy's life and good deeds demonstrates that a significant downward variance is not only appropriate, but is consistent with sentencing practices nationwide.

2.      Mr. Crummy's Personal History and Characteristics Support a Sentence of Probation.

Walt Crummy was born on October 15, 1952 in Warren, Minnesota as the oldest of five siblings, one brother and three sisters. Walt's father owned and operated a farm, and his mother was a teacher. Walt's parents instilled a strong work ethic in him, modeled the importance of

family and faith, and encouraged the children to be productive members of society. For 58 years, Walt carried out his parent's vision for how he would lead his life, and devoted himself to the service of his family and the community. The Court should consider this lifetime of good deeds and sentence Walt based on how he chose to live the vast majority of his life, not solely on the lapse of judgment that brought him into the criminal justice system for the first time.

<blockquote>a. <u>Walt Crummy is a dedicated family man whose wife, children, and grandchildren depend on him.</u></blockquote>

Walt spends every day trying to live up to his parents' example. He married his wife Margaret, now age 68, in July 1983, a woman who shares his values. They adopted two children at birth, sons Brian and Bradley, now ages 29 and 26, respectively. As Walt expressed in his letter to this Court, what he regrets most about his actions is the impact on his family:

> This has put an extreme amount of stress on my marriage, and I have wrecked my ability to give my wife the retirement we expected. I also have a number of other family obligations that I have let down. My granddaughter Colbi suffered a stroke in-utero and has partial paralysis on her right side, including her arm, hand, leg and foot. My ability to help my son pay for her treatment and therapy has been severely impacted by my actions. I hope that by accepting responsibility for my actions I can begin to repair the disappointment my family must have in me and begin the path forward to contributing to their lives again.

Letter from Walter Crummy to the Court (Dec. 1, 2016) (attached as Exhibit 1). Fortunately for Walt, his son Bradley, has not lost his faith in him:

> In all the years that I have known my father, not once have I ever seen him shed a tear. When he and my mother came up to tell me the news, I could tell he was absolutely crushed. He was forced to tell his son that he was in big trouble, and might go to jail as a result. I could tell from his staggered speech and body language, that this was one of the most difficult things he has ever had to do. I'm sure he felt as if he had let me down, in a big way. That could not be further from the truth. This whole situation, and him telling me what happened, made me think no less of him, not even a little. That is the power of the respect and love I have for him.

Letter from Bradley Crummy to the Court (Nov. 15, 2016) (attached as Exhibit 2).

Walt has not been employed since being terminated from Catamount Constructors Inc. ("Catamount"), and instead shares in the childcare duties for his grandchildren with his wife. In addition to providing childcare for grandchildren, Mr. Crummy regularly participates in assisting with Colbi's special needs.

Many of the letters that have been submitted on Walt's behalf speak of his dedication to his children and grandchildren. His daughter-in-law, Amber, summarizes his importance in their daily lives as follows:

> My husband, children, and I have been so blessed to have Walter and Margaret in our lives. My children get to see their grandparents almost every day. My youngest (currently the youngest), Colbi, suffered an in-utero stroke. Walt and Margaret have always been there for her. In the extra step, Walt has gone to the physical and occupational therapy sessions and then continues to work with Colbi at home. Walt, just the other day, went to a specialist visit with my husband and Colbi to asses her fine motor skills. She will be starting into their specialty school in January. We are very lucky to have a set of parents nearby who are so hands on and dedicated to our children's lives.

Letter from Amber Crummy to the Court (Nov. 3, 2016) (attached as Exhibit 3). Walt's son, Brian, echoed his wife's sentiments: "My wife and I have already received so much support from [Walt] in the years that we have been together, there would be no question in giving back tenfold the gratitude he has shown us." Letter from Brian Crummy to the Court (Nov. 12, 2016) (attached as Exhibit 4).

Similarly, Elaine Packard, a close family friend, had this to say about Walt's relationship with his children and grandchildren:

> I witnessed first hand how much the girls loved their Grandma, but I also witnessed how much they adored the time they got to be with their Grandfather! Walt is a tremendously important participant in the girl's lives, as well as, in the lives of their parents. Walt consistently made time to talk with both of his sons, to counsel, offer emotional support and guide them even though his own plate was more than full.

Letter from Elaine Packard to the Court (Oct. 27, 2016) (attached as Exhibit 5).

        b.      <u>Walt has a long history of service and commitment to the community.</u>

Unlike many white collar criminal defendants this Court sees, Walt did not find his faith and service to the community at the advice of counsel—he has been a dedicated member of his church and the community his entire adult life. As their two children grew up, Walt and Margaret sent them both to Catholic schools. Walt was very active in supporting both the schools and the parish community during this time and beyond, as described by Walt's former pastor, Rev. Andrew Kemberling:

> When St. Thomas More decided to open a school, Walt was among the first volunteers to go door-to-door to solicit funds for said school, which opened in 1994. He was also very active in other fund campaigns at St. Thomas More and at Regis High School. He made time to be a Cub Scout leader when his boys were young, and was very active in their school work and activities.
>
> Whenever Walt was free, I have known him to be very involved in parish work as a leader or as a participant in various ministries. . . He has worked for many years as a mentor for engaged couples and in marriage preparation.
>
>                              * * *
>
> I have also known about Walt's making time to pick up extra food from nearby restaurants for his current parish food pantry. I am sure many people who have benefited from this selfless act of compassion and solidarity for the poor.

Letter from Rev. Andrew Kemberling, V.F. to the Court (Oct. 28, 2016) (attached as Exhibit 6).

Another member of Walt and Margaret's church community, Laurence Smith (President and CEO of Catholic Charities of the Archdiocese of Denver), also speaks highly of Walt, stating that "I have known him to go out of his way to help people in our parish with moral, spiritual and material support without asking for any acknowledgement or credit. He is a caring and

thoughtful friend, partner and Father." Letter from Laurence Smith to the Court (Oct. 27, 016) (attached as Exhibit 7).[10] Both Reverend Kemberling and Mr. Smith have asked this Court to allow Walt to continue his service to others, and both have offered to help him to find productive uses of his time should this Court grant him a non-custodial sentence. Ex. 6 ("As a priest and Walt's former pastor, I would be very happy to work with Walt after his sentencing."); Ex. 7 ("Walt will always be welcome to help out at Catholic Charities and I have already suggested a job or two that we had open for him to work in.").

c.      <u>Walt has an unblemished work history</u>

As a result of his upbringing, Walt started working at a young age and continued to work until July 2015. His earliest job was working on the family farm, but when he went away to college at Moorhead State University, he worked his way through college, performing all manner of jobs from driving a garbage truck and shoveling snow to tutoring math. After graduating with a degree in mathematics and accounting, he spent the rest of his career as an accountant.

In 1998, Walt began working for MCC as the corporate Controller, and until the instant events, was by all means a model employee. The owners of Catamount purchased MCC in 2005. The new owners offered Walt and four other MCC employees ownership stakes and management positions. Again, but for the instant offense, there is no suggestion that Walt behaved in any way other than ethically and properly.

On January 1, 2013, all of the employees of MCC were folded into Catamount, Walt was made Vice President of Finance of Catamount and also purchased an ownership stake in Catamount. During the negotiation of MCC's plea agreement with the Government, Walt's

---

[10] Additional letters attesting to Walt's good character and deeds are attached as Exhibit 8.

employment and ownership stake in Catamount were terminated on July 23, 2015 without any compensation for the rescinded stock. The instant offense, which cost Walt all he had worked towards throughout his life, and all he had invested to build a thriving company that employed others, was the only instance where Walt's integrity has ever been called into question. The Court will hopefully judge Walt's professional life based on the entirety of that life, and not on the mistakes he made that brought him to where he is today.

3.     The Nature and Circumstances of the Offense Warrant a Variance from the Guidelines and Support a Sentence of Probation.

In sentencing Walt, the Court must also consider the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The nature of this offense strongly supports a probationary sentence. As discussed in detail above, and as the Government implicitly acknowledges in the Statement of Offense and the plea agreement, Walt was not the main player in or mastermind of this conspiracy. He only became aware of the conspiracy well after it began. As the Government acknowledges, MCC entered into only two contracts after he joined the scheme. These contracts were worth $1.6 million of the over $70 million in contracts MCC wrongfully obtained under the set-aside programs, a mere 2.2%.

Walt's limited conduct after joining the in-progress scheme, and his limited role even in that small fraction, does not warrant a sentence of incarceration. Walt Crummy was a minor player who, unlike many defendants this Court sees in fraud cases, was not motivated by greed. Instead, Walt participated in the scheme because stronger personalities influenced his better judgment; to his shame, Walt went along to avoid rocking the boat.

**C.    A Sentence of Probation Accomplishes the Goals of Sentencing in 18 U.S.C.
    § 3553(a)(2)**

Pursuant to 18 U.S.C. § 3553(a)(2), the Court must consider the need for the sentence to

"reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the

public from future crimes of the defendant; and to provide the defendant with needed . . . medical

care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(A-

D).  A consideration of all of these factors demonstrates that probation is the appropriate

sentence.

                1.    Probation Is a Sufficient Sentence to Reflect the Seriousness of the
                      Offense.

Fraud offenses are clearly serious, and Walt understands that what he did is wrong.  He

fully accepts responsibility for his actions.  He recognizes that he will have to live for the rest of

his life with the harsh consequences of this felony conviction.  But as set forth in section II.C

above, Walt was a minor participant in the crimes for which he pled guilty.  He was explicitly

told by MCC's President to have no contact with Michelle Cho and to focus on accounting

matters, and Walt had no direct involvement in securing the contracts from the Coast Guard, or

making representations about the work being performed and by whom.  Indeed, the only contact

Walt had with the Government was to facilitate late payments of invoices for services the

Government received already.

The Government suffered no pecuniary harm as a result of Walt's conduct—it received

the quality construction work for which it paid.  Moreover, although Walt does not minimize the

criminal nature of his conduct, much of the work on the contracts at issue was in fact performed

by small business subcontractors (carpenters, welders, plumbers, etc.), including by participants in the SBA's programs for disadvantaged small businesses.

> 2. Probation is a Sufficient Deterrent in Light of the Consequences Walt Crummy has Already Suffered.

As a result of the activity for which Walt is convicted, he has already suffered consequences sufficient to deter him and others from committing future or similar crimes. Walt is now a 64 year old unemployed, and unemployable, former accountant. He lost any possibility of reactivating his CPA license and thus will never work again in his chosen field. He has not worked since July of 2015, when he was terminated in relation to the MCC scheme. As one court recognized, "[s]pecific deterrence is achieved through the impact of this conviction on the defendant's employability." *United States v. Rowe*, No. 10-CR-607, 2011 WL 6019010, at *2 (E.D.N.Y. Nov. 29, 2011).

Further, Walt's actions have resulted in severe economic consequences: he has paid the government more than $330,000 in connection with the MCC scheme, well in excess of any proceeds he received. *Cf.* U.S.S.G. § 5K2.0(d)(5) ("The defendant's fulfillment of restitution obligations only to the extent required by law including the guidelines (i.e., a departure may not be based on unexceptional efforts to remedy the harm caused by the offense)."). Walt has in fact made exceptional efforts to rectify his harms. He contributed nearly $225,000 to the MCC corporate criminal resolution through the conversion of his ownership interests in both MCC and Catamount[11] and agreed to a $105,618[12] forfeiture in his own plea agreement, a commitment he

---

[11] Walt's contributions relate to his ownership interest in the assets of MCC and the involuntary conversion of his shares in Catamount, both of which were used to satisfy the MCC plea agreement.

has already fulfilled.  Moreover, these payments were based on *all* of MCC's contracts involving Michelle Cho, and as noted above, Walt was only involved in the scheme as to the two Coast Guard contracts, contracts which resulted in an actual loss to MCC.

        3.      Probation is Sufficient Because Mr. Crummy Is a First Time Offender with an Extremely Low Probability of Reoffending.

As the PSR makes clear, Mr. Crummy has a criminal history score of zero giving him a criminal history category of I.  PSR ¶ 126.  For the first 58 years of Mr. Crummy's life, he led a lawful, productive life.  He is a college graduate, has been employed from a young age until this case, and has no history of drug or alcohol abuse or mental illness.  The offense of conviction is totally out of character with the vast majority of Mr. Crummy's life as a devoted father and grandfather, community member, and trusted CPA, as attested by his numerous friends and family who have written this Court on his behalf.[13]  Courts consider this factor when determining sentences under § 3553(a)(2).  *See Howe*, 543 F.3d at 133 (sentencing variance based on "isolated mistake" after leading "an honorable and lawful life until this point," notwithstanding that offense conduct occurred over a two-year period); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was "law abiding citizen, who [did] an incredibly dumb thing").  Further, having lost his CPA license and been suspended, and most likely debarred, from government contracting, Walt will never have the chance to reoffend.

---

[12] Walt will have paid his $105,618 forfeiture payment to the U.S. Marshalls prior to his sentencing date.  He is currently awaiting instructions from the U.S. Attorneys' Office on the mechanism for sending the payment.

[13] Notwithstanding that Walt made mistakes involving two contracts here, his criminal conduct was truly aberrant behavior in his long-life, and strongly militates against the harsh penalties of the Sentencing Guidelines.  *See* U.S.S.G. § 5K2.20.

### D.    Medical Condition.

In April 2009, Walt was diagnosed with Chronic Lymphocytic Leukemia ("CLL"), a bone marrow cancer that affects white blood cell production.  *See* PSR ¶ 88.  This Court should consider the "need for the sentence imposed . . . to provide the defendant with needed . . . medical care."  18 U.S.C. § 3553(a)(2)(D).  Although Walt's cancer does not currently require medication or chemotherapy, he requires close monitoring, including blood work and visits to his hematologist every three months.  Letter from Dr. Drexelius (attached at Exhibit 8).  Since 2015, Walt's cancer has progressed from Stage 0 to Stage 1 and his white blood count has increased approximately 2.5 times, which is an indication that his condition is progressing.  Additionally, Walt has also recently experienced floaters in his eyes that make him unable to read or drive, and which have required treatment by an ophthalmologist.  *See* PSR ¶ 89.  Lastly, Walt suffered a bulging disk in his back in 1999, and as a result he cannot perform repetitive or manual labor without experiencing significant pain.  *See id.* ¶ 87.  Consequently, probation is the most appropriate sentence taking into account Walt's physical health needs and the effect incarceration would have on his ability to receive treatment for these conditions.

### E.    Avoiding Unwarranted Sentencing Disparities.

As noted above, during the sentencing of MCC, the Court acknowledged that "if the Court were to calculate the sentencing guideline in the manner that the government has asked [that is, the full value of the contracts], those cases indicate that substantial downward departures or variances are ordinarily given in cases of this nature."  *Cho*, Plea Agreement at 2 n.1 (quoting Sentencing Hr'g Tr. at 29, *United States v. MCC Constr. Corp.*, 16-cr-00004 (KBJ), Mar. 15, 2016.)).  The same is unquestionably true here.

Further, the Government made a similar note in *Singh*, which the court discussed in depth, albeit in a footnote:

> Indeed, as the government notes in its sentencing memorandum, "it is a goal of the Guidelines to avoid unwarranted sentencing disparities," and "***even in circuits ... that base loss on the full value of the contracts, it appears that sentencing courts routinely sentenced below the applicable Guidelines range—and often significantly below the range.***" And "***when one examines the sentences actually imposed, it appears that regardless of whether loss for purposes of the Guidelines calculation is based on the full value of the contracts or some other metric, the sentences ultimately imposed seem to be more consistent with loss being based on the profit that the defendants generated from the schemes.***"

*Singh*, 2016 WL 3443906, at *6 n.4 (emphasis added) (internal citations omitted). In its Sentencing Memo in *Singh*, the Government acknowledge that "[i]ndeed, in nearly every reported case—and in nearly every unreported case of which the Government has anecdotally learned—the sentencing courts that conclude that loss equals the full value of the contracts, have varied or departed downwards." Gov't Mem. at 31, *Singh v. United States*, No. 1:15-cr-00173-RBW (D.D.C. Mar. 21, 2016) (ECF No. 12). It would thus be contrary to the language and intent of 18 U.S.C. § 3553(a)(6) for the Court to fail to vary downward, as it would harshly punish Walt in comparison with other, similarly situated defendants. 18 U.S.C. § 3553(a)(6) (Courts should consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

In addition to the cases discussed above that demonstrate the appropriateness of a significant downward variance here, other cases with similarly situated defendants show that a prison sentence for Walt Crummy would not be warranted. Indeed, in most cases of this type, the Government generally pursues civil cases against prime contractors who fraudulently hold themselves out to qualify for set-aside contracts. In the rare circumstances where the Government brings a criminal action against an individual, courts nearly always depart from the

Guidelines range when determining the sentence.[14]  Additionally, many of these cases involve

company owners who create the fraudulent shell entities that obtain the contracts, rather than

those who later participate in the scheme, and many involve addition criminal conduct such as

tax fraud committed to conceal the underlying small business fraud.  Walt has plainly not

engaged in such conduct.

## IV.    CONCLUSION

Walt Crummy acknowledges that he made a mistake and accepts full responsibility for

his conduct.  But he asks that the Court consider his entire background when imposing a

sentence, especially his dedication to his family and community.  He is a devoted husband,

father, grandfather, brother, and friend.  Although Walt made mistakes, his commitment and

contributions to his community should overcome those mistakes when the Court determines an

appropriate sentence.  As advocated by Reverend Kemberling: "Having known Walt and his

many good works for many years, I beg, Your Honor, for your mercy and compassion when

sentencing Walt, who has been very remorseful of his guilt, and regrets the wrong he has done.

Please allow him to continue doing his good works outside of prison.  I strongly feel that there

would be more benefits to society if he were not incarcerated."  Ex. 6.

A sentence of probation would adequately reflect the seriousness of the offense, promote

respect for the law, and provide just punishment for Mr. Crummy.  The significant mitigating

---

[14] *See, e.g.*, Press Release, Department of Justice, Lone Tree Businessman Sentenced for Conspiracy Involving False Statements to SBA and False Income Tax Returns (Oct. 2, 2015) (sentence of 6 months confinement and 1000 hours of community service); Press Release, Department of Justice, Connecticut Man Sentenced For Claiming To Operate Minority, Service-Disabled Veteran Business (June 28, 2013) (sentence of 6 months home detention and 200 hours of community service).

factors relating to Mr. Crummy's offense and his personal, professional, and community

background provide compelling support for a sentence of probation.  Mr. Crummy appreciates

the Court's consideration of this information.

Respectfully submitted,


Dated: December 6, 2016                          /s/ Ralph J. Caccia

Ralph J. Caccia
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
202.719.7242
rcaccia@wileyrein.com
*Counsel for Walter J. Crummy*