## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **Criminal No. 16-CR-133 (KBJ)** |
| | : | |
| | : | |
| WALTER CRUMMY, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia and the United States Department of Justice, Antitrust Division, respectfully submits its Memorandum in Aid of Sentencing. The United States recommends that this Court conclude that the applicable United States Sentencing Guidelines Range for the defendant, Walter Crummy (hereafter "Crummy" or the "Defendant"), is 30 to 37 months, but the United States acknowledges a downward variance may be appropriate, and recommends that the Defendant be sentenced to 12 months and 1 day of probation. The United States also recommends that the Court impose as a condition of probation a term of home detention of at least 6 months. The United States further recommends that this Court order forfeiture in the amount of $105,618; and that this Court impose a one-year period of supervised release. In support thereof, the United States respectfully states the following:

## FACTS

At a plea hearing on August 23, 2016, the Defendant admitted to the following facts:

## Relevant Law

1.      The "8(a) program" is a program administered by the Small Business Administration ("SBA").  The program is named for Section 8(a) of the Small Business Act and is a development program that was created to help small, disadvantaged businesses compete in the American economy and access the federal procurement market.  To qualify for the 8(a) program, a business (commonly referred to by the SBA and other government agencies as the "firm") must be at least 51% owned and controlled by a U.S. citizen (or citizens) of good character who meet the SBA's definition of socially and economically disadvantaged.  The firm also must be a small business (as defined by the SBA) and show a reasonable potential for success.

2.      The SBA's 8(a) program exists, among other reasons, to facilitate the economic development of competitive small businesses that contribute to the overall health of the U.S. economy.  The program also exists to ensure that large corporations do not gain monopoly positions with respect to U.S. government contracting.  The SBA's 8(a) program furthers the additional goal of developing competitive small businesses owned by historically disadvantaged socioeconomic groups.  The U.S. government agencies that award 8(a) contracts further these goals by, among other things, awarding contracts on either a set-aside basis, where the only competitive bidding is among similarly eligible firms, or on a sole-source basis, without competitive bidding.  In doing so, those agencies further the congressional intent of the 8(a) program by ensuring that 8(a) firms (and not other, ineligible firms) receive the benefit of the profits from the awarded contracts and the benefit of performing the volume of business from those contracts.

2

3.      As a prerequisite to participation in the 8(a) program and to further payment under

any government contracts subsequently awarded through that program, a firm must apply and

qualify for participation in the 8(a) program through a formal SBA-administered application

process.  In addition, all 8(a) firms must submit annual reviews that the SBA uses to monitor

eligibility.  Firms can remain in the 8(a) program for up to nine years provided they maintain that

eligibility, at which point the SBA considers a firm to have "graduated" from the 8(a) program.

Once a small business graduates from the program, it is no longer eligible to obtain government

contracts reserved for Section 8(a) program participants.

4.      The SBA can revoke a firm's 8(a) status during that nine-year term by "graduating"

it early if the agency determines that it no longer meets the criteria for certification.  SBA

regulations require firms to inform the SBA of any changes that would adversely affect program

eligibility while they are participating in the 8(a) program.  The SBA also may terminate a firm

from the 8(a) program for good cause, such as submission of false information or failure to

maintain eligibility requirements.  After a firm loses its 8(a) eligibility, it cannot reapply, even if

it changes its name or management.  Similarly, after a firm loses 8(a) status, the disadvantaged

individual upon whom eligibility was based is no longer eligible to qualify with another firm.

5.      Participants in the 8(a) program are subject to regulatory and contractual limits on

subcontracting work from 8(a) set-aside contracts.  The SBA regulations require, among other

things, the 8(a) company to agree that on construction contracts it "will perform at least 15% of

the cost of the contract with its own employees (not including the costs of materials)."  13 C.F.R.

§ 125.6(a)(3).  Likewise, the Federal Acquisition Regulation ("FAR") requires all contracting

officers for the Government to include a clause in 8(a) set-aside contracts, which recites the

3

applicable restriction on subcontracting. 48 C.F.R. § 19.811–3 (requiring contract officers to put clause 52.219–14, Limitations on Subcontracting, in any solicitation and contract arising from 8(a) contracting). Clause 52.219–14 reads, in pertinent part, "[b]y submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for . . . general construction the concern will perform at least 15% of the cost of the contract, not including the cost of materials, with its own employees." 48 C.F.R. § 52.219–14(c). The limitation on subcontracting is both a regulatory and contractual requirement for contractors to receive the benefits of the 8(a) Program.

6.      The SBA also administers the Historically Underutilized Business Zone ("HUBZone") program. To qualify for the HUBZone program, a company must establish that: i) it is a small business; ii) it maintains a principal office located within an area that has been designated as a HUBZone; and iii) at least 35% of its employees reside within designated HUBZone areas. 13 C.F.R. § 126. A company that applies for, and is granted, HUBZone status by the SBA qualifies to receive federal government contracts that are set aside for certified HUBZone companies. A HUBZone-certified company is obligated to immediately inform the SBA of any material changes in its status. Such changes would include a change in ownership, a change in primary business address, a change in business structure, or a change in the company's compliance with the 35% residency requirement. For construction contracts, the HUBZone business must perform, at least, 15% of the cost of contract performance incurred for personnel on the HUBZone company's employees.

4

**Background**

7.      MCC Construction Corporation ("MCC") was a construction management company and a general contractor that provided design/build, renovation/restoration, and new construction services.  It was founded in 1986, and its home office was located in Greenwood Village, Colorado, with regional offices in different parts of the country.  MCC was actively managed by Crummy, Thomas Harper, Person D, and Person F, who were owners of MCC.

8.      Far East purported to specialize in, among other things, design build services of energy and renewable programs; general contracting and construction staffing services; and mechanical, electrical, plumbing, renovation, and carpentry.  At all relevant times, Far East was certified to participate in the 8(a) program and was headquartered in Illinois.  Far East's primary business address was the home address of relatives of Michelle Cho.  For portions of the relevant period, Far East was also certified to participate in the HUBZone program.

9.      Company 2 purported to specialize in, among other things, design build services of energy and renewable programs; general contracting and construction staffing services; and mechanical, electrical, plumbing, renovation, and carpentry.  At all relevant times, Company 2 was certified to participate in the 8(a) program.  Company 2 routinely used Far East's business address as one of its addresses.

10.     At all relevant times, Crummy was an officer of MCC—holding, at various times, the titles of Controller and CFO—and one of the owners of the company.  He played no role in project delivery.

11.     At all relevant times, Thomas Harper ("Harper") was an officer of MCC and one of the owners of the company.

12.     At all relevant times, Michelle Cho ("Cho") resided in Illinois.  At various times throughout the relevant period, Cho held officer positions with Far East and Company 2.

13.     At all relevant times, Person D was an officer of MCC and one of the owners of the company.

14.     For portions of the relevant period, Person F was an officer of MCC and one of the owners of the company.

15.     At all relevant times, the email communications sent in furtherance of this scheme were transmitted in interstate commerce.

## Overview of the Scheme at MCC

16.     MCC executed and caused to be executed a scheme and artifice to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing they were false and fraudulent when made, for the purpose of executing such scheme and artifice and attempting so to do, did cause to be sent and delivered interstate wire communications.

17.     MCC engaged in and executed a scheme from, at least, in or around January 2008, through in or around August 2013, to defraud a number of government agencies, including the SBA; the General Services Administration ("GSA"); U.S. Army, Mission and Installation Contracting Command; U.S. Navy, Naval Facilities Engineering Command; U.S. Air Force, Air Force Material Command; U.S. Department of Commerce; U.S. Coast Guard, Civil Engineering Unit; U.S. Army Corps of Engineers; U.S. Fish and Wildlife Service; and U.S. Property and Fiscal Office for California by, among other things: (i) operating Far East and Company 2 as entities with titled owners over whom MCC exerted impermissible control; (ii) concealing that MCC, which

6

was not eligible for the aforementioned SBA contracting preferences, exercised impermissible control over Far East and Company 2; (iii) causing misrepresentations that Far East and Company 2 were in compliance with SBA regulations pertaining to Far East's and Company 2's contracts, including that Far East and Company 2 employees had performed the required percentage of work on those contracts; (iv) engaging in deceptive practices to make it appear that MCC employees were actually employees of Far East and Company 2; and (v) obtaining, at least, approximately $70,274,894 in U.S. government contracts as a result of false and misleading conduct.

18.     As described in greater detail below, MCC participated in the scheme described above to obtain U.S. government contracts based on SBA-administered contracting preferences to which MCC was not entitled, and MCC did so for the purpose of enabling MCC and others to benefit improperly from the payments received in relation to those contracts, the volume of business performed pursuant to those contracts, and the expected future gain from performing those contracts.

19.     On or about December 24, 2009, Crummy knowingly and voluntarily began participating in the fraudulent scheme as it was executed by MCC and Far East.

## Criminal Conduct

*Crummy Understood that MCC and Far East Partnered on Contracts and that these Contracts Were Governed by SBA Rules and Regulations*

20.     In and around February 2008, Person D, on behalf of MCC, and Far East signed a teaming agreement related to the first of the approximately $56 million worth of contracts obtained through this scheme. According to the terms of the agreement, which had been reviewed and approved by MCC's external legal counsel, Far East was responsible for contract delivery efforts and there was supposed to be clear delineations of responsibility between MCC and Far East. For

7

instance, the agreement required that Far East "prepare the competitive proposal, integrate the information provided by [MCC], and submit the competitive proposal to the [contracting agency]." If a contract was awarded, Far East was to "[s]upply, as salaried employees, the contract manager and quality control staff with assistance of [MCC]." The agreement also made clear that, with limited exception, "neither Party will be liable to the other for any costs, expenses, risks, or liabilities arising out of the other Party's participation in the preparation, submission, or sustaining of competitive proposals under the Solicitation." A number of these clear responsibilities were added to the teaming agreement by MCC's external legal counsel so that the teaming arrangement would comply with applicable SBA rules and regulations. MCC entered into similar teaming agreements on other contracts they jointly pursued.

21.    The SBA rules, regulations, and restrictions were known to Crummy, Harper, Person D, and Person F. On or about January 17, 2008—the day after MCC and Far East executed a reimbursement agreement—Person F emailed Crummy, Harper, and Person D guidance that discussed the "perils" and "pitfalls" of teaming agreements, addressing, among other subjects, the fact that the prime contractor must have a defined role that allows it to meet its legal obligations. The guidance also noted that a "proposed subcontractor must not have a role in contract management, particularly, a role where subcontractor employees are the key personnel to interact with agency technical managers."

22.    On or about September 23, 2008, an MCC employee forwarded to Crummy, Harper, Person D, and Person F a Department of Justice press release reporting criminal guilty pleas in connection with a scheme in which a small business used its preference to obtain contracts and then unlawfully passed those contracts and the revenue for the contracts to large companies in

exchange for a small fixed fee.  In the email forwarding the press release, the MCC employee wrote, "read the following by US Department of Justice—*some of it sounds really close to what MCC is doing*—my biggest concern also is—is MCC setting up accounts to receive payment from the government (control the account) if so I don't believe this would be legal?" (emphasis added.)

23.     On or about November, 20, 2008, Far East and MCC implemented operating procedures that made Far East nothing more than a pass through for the contracts Far East subcontracted to MCC.  These procedures were set up by Crummy and Person D.  Crummy set up a bank account in the name of Far East to receive all payments from the government and then pay all related expenses and distribute profits.  MCC and Far East had joint signatory authority over that account.  Proposals sent to the government, however, caused payments to go to a bank account solely controlled by Far East.  On or about November, 20, 2008, a Far East contract specialist informed Harper that Far East just received a payment from the government of approximately $66,000 and asked Harper what Far East should do with this payment and all other payments Far East received where MCC was the subcontractor.  The following exchange occurred between and Harper and the contract specialist:

> Harper:     You send us the whole thing.
>
> Far East
> Employee:   ok so just to confirm on every project with MCC we will pay the
>             entire amount received in the bank account. . . .
>
> Harper:     That's correct [Far East Employee], it will always be the entire
>             amount.

Later in the relationship, MCC sent invoices to Far East detailing the amount to be paid to MCC after funds were received from the government.

*Crummy, Harper, Cho, Person D, and Person F Received a Warning from the SBA that the Way in Which MCC and Far East Were Operating Violated SBA Rules and Regulations*

24.     On or about August 18, 2008, MCC, at Person F's direction, submitted a proposal that purported to be from Far East for a GSA solicitation related to a building in Boston ("the Boston Solicitation"). The proposal made numerous references to MCC and provided resumes for a number of the key personnel for the project which revealed that these individuals were MCC employees. Crummy was not involved in drafting this proposal for MCC.

25.     On or about November 17, 2008, a GSA contracting officer sent a letter to Cho, explaining that Far East was in the competitive range for the Boston Solicitation, but asking Far East to address weaknesses and deficiencies identified in the bid. Among other things, the contracting officer asked Cho to explain the relationship between Far East and MCC and to confirm that Far East would be able to meet the minimum work requirements under the regulations—that is, performing at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees.

26.     On or about November 18, 2008, Cho sent a letter to the GSA contracting officer affirming that Far East would meet the minimum work requirement if GSA awarded Far East the Boston Solicitation.

27.     The November 18, 2008, letter did not satisfy the GSA contracting officer's concerns. On or about November 21, 2008, the contracting officer sent an email to Cho further questioning the nature of the relationship between MCC and Far East.

28.     On or about November 24, 2008, Person F sent an email to Crummy, Harper, and Person D, expressing concerns about the implications of an adverse ruling from a government agency on the relationship between MCC and Far East. First, Person F recognized that an adverse

decision seemed unavoidable, and noted that: "the outcome of any response we submit seems to be demonstrably clear—we are going to have a government agency tell us that our 'arrangement' fails to meet the definition of a small business and we are in fact affiliated." Second, Person F recognized that such a determination could have ramifications beyond the Boston Solicitation: "going forward this has the potential create [sic] some serious problems should we continue to pursue contracts under the this [sic] relationship. There are some obvious ethics rules that come in to play and I certainly don't want to be the one to tell any other agency/investigator that our relationship had been flagged on other solicitations." Person F concluded his email by recommending that MCC find a solution that avoided a ruling from the GSA:

> The point is this; why push a Government organization to make an official determination (most likely made by the SBA) when the outcome is preordained? By far the best approach would be not to respond at all. The issue disappears and we still have our virginity. Third base, hopefully, won't be part of the record and we can at least say with a straight face that we're virgins. If it too [sic] late, we're screwed already and it won't matter.

Although Crummy was copied on this email, Crummy did not play any role in deciding how MCC should respond to the SBA.

29.    On or about December 19, 2008, GSA notified offerors that Far East was an apparent successful offeror for the Boston Solicitation. That same day, though, the GSA contracting officer filed a protest with the SBA, claiming that Far East was other than a small business for purposes of the Boston Solicitation because of the relationship between Far East and MCC.

30.    On or about January 22, 2009, the SBA issued a determination, concluding, for purposes of the Boston Solicitation, that Far East was other than a small business. Among other

11

things, the SBA noted, for purposes of this solicitation, that Far East's "heavy reliance on MCC [was] patently clear" from Far East's proposal; that every resume submitted with the proposal was an MCC employee, not a Far East employee; and that the proposal repeatedly identified MCC, not Far East, personnel as the individuals who would be responsible for satisfying solicitation requirements. The SBA concluded that, for purposes of the Boston Solicitation, "Far East's ability to perform depend[ed] heavily, if not entirely, on MCC's experience, expertise, and personnel."

31.     In addition to concluding that Far East was other than a small business for purposes of the Boston Solicitation, the SBA also noted the contradiction between the materials submitted for the Boston Solicitation and Cho's and MCC's subsequent representations:

> This determination depends upon choosing between two contradictory presentations from [Far East]: the proposal submitted to GSA in order to win the solicitation or subsequent e-mails sent . . . to explain its position. The two cannot be reconciled inasmuch as the proposal so clearly and unambiguously describes a team, complete with staffing decisions and clear lines of responsibility.

Crummy received a copy of the SBA's January 22, 2009, determination.

*Despite Awareness of the SBA Regulations, Crummy Joined the Criminal Conspiracy at MCC*

32.     Crummy ultimately voluntarily and knowingly participated in the fraudulent scheme orchestrated by MCC.

33.     By at least December 24, 2009, Crummy learned that Far East was not providing any labor on the projects on which MCC and Far East partnered. On December 24, 2009, Crummy, Harper, and Person D discussed, via email, a request from Cho that MCC treat the cost of Far East's accountant as a cost for which MCC reimbursed Far East. In proposing a strategy for dealing with Cho's request, Harper wrote to Crummy and Person D, "I really think [Cho] needs to

12

consider the reality of the situation, *which in my opinion is us handing her large returns for no risk and no work.* This must of course be done carefully, since a very large and profitable part of our work in the NE is with [Cho]." (emphasis added.)  In speculating about what prompted this request from Cho, Harper wrote, "[i]n the end the real issue is that they see good money coming our way and their share is reduced by having to pay an accountant and an admin to help count and track all of it. The pain of success, we all wish we didn't need those darn accountants."

34.     On or about January 19, 2010, Crummy, as instructed by Harper following Harper's negotiations with Cho, prepared and circulated to Harper, Person D, and Person F a proposed addendum that would be applied to existing profit and cost reimbursement agreements for two contracts obtained through the scheme.   The proposed addendum included the following provisions:

> 3.     Upon award of each and every task order under the Contract by the Government to [Far East], [Far East] will award a subcontract for that task order in the amount of 97% of the amount of that task order to MCC.
>
> 4.     MCC will furnish all labor, equipment, material safety and supervision to perform the respective scope of work of the task order.
>
> . . . .
>
> 6.     Upon agreement with MCC, if [Far East] executes a subcontract directly with a subcontractor for a portion of the scope of work of a specific task order, then [Far East] will deduct that amount from its subcontract agreement with MCC however MCC will continue to be responsible for the supervision of that subcontractor unless another written agreement is executed.
>
> 7.     MCC will pay all site overhead costs . . .

In and around February 2010, these addendums were executed. Crummy was aware that these

principles—that MCC would provide all labor, equipment, material safety and supervision and receive 97% of the task order amount—would become the operating principles for contracts that Far East subsequently obtained and subcontracted to MCC.  Under this arrangement, Far East lent its name and small-business status and MCC bore nearly all of the expenses of actually fulfilling these contracts.   The agreement, by its terms, meant that Far East would be violating the requirement that it perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees.

35.     Moreover, when interacting with the government on behalf of Far East after December 24, 2009, Crummy used an email account that had Far East's name in the domain address.  This email account included a signature block identifying Crummy as a Far East employee.  By way of example, in and around April 2010, Crummy exchanged emails with the Defense Finance and Accounting Services (DFAS) about the status of payments to Far East.  In addition to the account information that created the false appearance that Crummy was a Far East employee, Crummy wrote the emails in a way that suggested that he was a Far East employee.

*Contracts Obtained After December 24, 2009*

36.     After Crummy knowingly and voluntarily joined the scheme, MCC obtained the following contracts through Far East:

14

| Award Recipient | Contract Name | Contract Number | Award Date | Date Complete | MCC Revenue |
|---|---|---|---|---|---|
| Far East | Coast Guard – North | HSCGG-110-D-PRV057 | 8/6/10 | 9/30/11 | $842,482 |
| | | | | | |
| Far East | Coast Guard – South | HSCG-821-D-PMVA39 | 2/9/11 | 1/31/13 | $788,895 |
| | | | | Total: | $1,631,377 |

37.     With respect to the 8(a) and HUBZone contracts above, Far East, in furtherance of its scheme with MCC, attested to procuring U.S. government agencies that it was an eligible SBA 8(a) firm, and MCC and Far East conspired to submit these false attestations with the intent that the procuring agencies would rely on the attestations in their respective award processes and in providing the listed payments.  For the reasons set forth above, Far East's representations in this regard were false because it was not a legitimate 8(a) or HUBZone firm and because MCC, which was an 8(a)- and HUBZone-ineligible entity for purposes of the contracts listed above, improperly exerted control over Far East.  The revenue MCC obtained from the scheme with Far East constituted 18 percent of MCC's total revenue during the relevant period.

38.     By the terms of the MCC's agreements with Far East, the two companies anticipated a 10 percent profit margin.  Accordingly, for the two contracts referenced above, the anticipated profit was $163,137.  Nevertheless, both contracts resulted in an actual loss to MCC.

*Crummy Salary and Bonus*

39.     From January 1, 2010, through the end of the relevant period, Crummy received from MCC the following salary and bonus:

|  | 2010 | 2011 | 2012 | Total |
|---|---|---|---|---|
| Total Salary | $126,940 | $137,609 | $146,836 | $411,385 |
| Total Bonus | $102,234 | $63,153 | $10,000 | $175,387 |

Crummy's total salary and bonus from this period is $586,772. Eighteen percent of this amount would equal $105,618.

## STATUTORY PENALTIES

Defendant faces a maximum sentence of five years of imprisonment; a fine of up to $250,000; a term of supervised release of up to three years; and a $100 special assessment. Draft Presentence Report ("DPSR") ¶¶ 123, 130, 139, 140 (citing relevant statutory sections).

## SENTENCING GUIDELINES AND FORFEITURE

The U.S. Sentencing Commission, *Guidelines Manual* ("Guidelines" or "USSG") calculation in the DPSR places Defendant's total offense level at 19. DPSR ¶ 71. The DPSR calculates Defendant's criminal history in Category I (0 points). DPSR ¶ 74. The DPSR concludes that the applicable Guideline range for Defendant is therefore 30 to 37 months of imprisonment and one to three years of supervised release. DPSR ¶¶ 124, 131. The DPSR states that the Defendant agreed to a forfeiture money judgment in the amount of $105,618. DPSR ¶ 14. This is not a case where mandatory restitution applies under 18 U.S.C. § 3663A, and the United States is not seeking restitution against Defendant.

## SENTENCING GUIDELINES ANALYSIS

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007) (citation omitted). In

addition to the Guidelines, the Court also must consider the factors set forth in 18 U.S.C. § 3553(a), which include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment, (3) the Sentencing Guidelines and related Sentencing Commission policy statements, and (4) the need to avoid unwarranted sentence disparities.

The United States agrees with the DPSR calculation of the applicable Guidelines range. The defense, however, has objected to the DPSR's calculation of the offense level, arguing that the DPSR incorrectly determined the loss amount in this case. The DPSR determined that the loss was $1,631,377, which is the total price of the contracts misappropriated during the Defendant's participation in the scheme at issue. That loss amount results in an increase of 16 points to the offense level calculation. DPSR at ¶ 63. The defense asserts that the loss in this case is zero, however, because MCC performed on the contracts at issue and even lost money in doing so. Under this theory, the zero loss results in a final offense level of three, and Guidelines range of zero to six months. However, the defense's view of the loss amount in this case is mistaken.

Here, loss should be based on the full value of the contracts obligated in connection with the scheme for three reasons. *First*, in 2010, Congress mandated by statute that loss in SBA fraud cases is presumed to be the total amount expended on contracts. *Second*, the Sentencing Guidelines, the relevant Application Notes, and the policy considerations reflected in the Sentencing Guidelines support calculating loss as the total amount obligated on the contracts.

17

*Third*, the totality of the applicable case law supports the conclusion that loss should be based on the full value of the contracts obtained in connection with the scheme.

       *i.     Statutory Presumption*

In 2010, Congress specifically addressed the issue of how loss should be quantified in a small-business-fraud scheme similar to the scheme in which the Defendant participated.  As part of the Small Business Jobs Act, Congress created, and the President signed into law, a statutory presumption that loss in such a scheme is equal to the full value of the contracts obtained.  The presumption, codified at 15 U.S.C. § 632(w) provides:

> In every contract, subcontract...or grant which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be *a presumption of loss to the United States based on the total amount expended on the contract*, subcontract...or grant whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation.

(emphasis added).   The Senate Committee on Small Business and Entrepreneurship, which considered this language in the context of another proposed Act that contained this exact same language, emphasized that this language creates an "*irrefutable presumption of a dollar-for-dollar loss* to the United States in every contract . . . reserved for small business concerns which is obtained by misrepresentation of small business size or status."  *See* S. Rep. No. 111-343 at 8 (2010).[1]  The Committee also stated that it intended "that this presumption shall be applied in all

---

[1]      This Senate Report accompanied bill S. 2989, 111th Cong. (2010), which the Senate Committee on Small Business and Entrepreneurship unanimously reported on March 4, 2010, but on which the full Senate ultimately did not vote.  That Senate bill, however, contained the same presumption-of-loss language quoted above, which Congress later passed in 2010 (Small Business Jobs Act of 2010 (H.R. 5297)), and which the President signed into law on September 27, 2010 (Pub. L. 111-240).

      The United States further notes that in one unpublished decision, the Middle District of Florida found that this presumption of loss rule applied only in cases where the business misrepresented its size, as opposed to its status.  *A1 Procurement, LLC v. Hendry Corp. et al.*, Case 1:11-cv-23582-CMA (M.D.Fl., June 26, 2013).  That

manner of criminal, civil, administrative, contractual, common law, or other actions, which the United States government may take to redress such fraud and misrepresentation." *Id.* The Small Business Jobs Act was signed into law on September 27, 2010, and became effective on that date.[2] Since the statutory language is clear and unambiguous, the Court need not apply any other canons of statutory construction to interpret it. *See, e.g.*, *Caminetti v. United States*, 242 U.S. 470, 485 (1917); *United States v. Cordova*, 806 F.3d 1085, 1098 (D.C. Cir. 2015).

The language of 15 U.S.C. § 632(w) is silent as to its *ex post facto* implications and, for purposes of this sentencing memorandum, the government is not arguing that it applies *ex post facto*. Even if one applies the presumption in 15 U.S.C. § 632(w) to only the contract awarded after September 27, 2010, that contract had a value of $788,895, which by itself (*i.e.*, without attributing any loss at all to the pre-September 27, 2010, contract, which had a total value of $842,482) results in a 14-level adjustment, not the 0-level adjustment sought by the defense. Accordingly, based on the clear and unequivocal language of 15 U.S.C. § 632(w), the United States submits that the minimum adjustment for loss amount is 14 levels and that the Guidelines and applicable case law must resolve the additional impact of the contract (awarded prior to September 27, 2010) on loss.

---

decision, however, pre-dated the promulgation of regulations interpreting the rule as applying to both size and status. *See* 78 Fed. Reg. 38811 (June 28, 2013) ("The purpose of [the Small Business Jobs Act] and implementing regulations is to prevent or deter firms from misrepresenting their size or socioeconomic status.").

[2]    When enacted, Pub. L. 111-240 set forth specified effective dates for some of its provisions, but did not include a specified effective date for 15 U.S.C. § 632(w). The effective date is thus presumed to be the date of enactment. *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (citations omitted) ("It is well established that, absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment.").

ii.    *Guidelines Application Note Covering Government Benefits Programs*

For the duration of the scheme in which Defendant participated, a special rule within the Application Notes to § 2B1.1 has existed that directly addresses the issue of loss in a small-business-fraud scheme of this nature.  The special rule, currently labeled as USSG § 2B1.1, Application Note 3(F)(ii), provides that "[i]n a case involving government benefits (*e.g.*, grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." The contracts awarded through the 8(a) program fall within the scope of Application Note 3(F)(ii): the government-administered 8(a) program provides a series of benefits to those business organizations that establish that they are intended recipients of benefits—meaning that they apply for, and receive, 8(a) status from the government.   The 8(a) program currently includes approximately 4,700 firms, and results in awarding around $16 billion annually to those firms for a wide variety of services or products needed by the federal government. *See* Affidavit of Kenneth W. Dodds, Director of the Office of Policy, Planning, & Liason at the SBA ("Dodds Affidavit"), at ¶ 5, attached hereto as Exhibit A.  However, the 8(a) program does not simply put money in the hands of certain businesses, though: it provides companies with experience, and builds economic strength in communities and with regard to individuals (both business owners and their employees) who have historically been at a disadvantage in our country. *Id.*  Participation in the 8(a) program is limited to nine years, and the program is akin to an education and experience program that has as its goal graduating a business so that it can compete on its own for contracts going forward. The contracts that 8(a) participants receive are not generally available, but are set aside for 8(a) firms.  The program includes a Mentor-Protégé Program, as well as a great deal of other services

20

such as help with maintaining business plans, financial counseling, and marketing and management assistance. *See* 15 U.S.C. §§ 636 and 637.

When a person obtains a contract with the government under the false pretense that s/he qualifies for the 8(a) program, real, substantial harm is done. The harm includes, but is not limited to, preventing deserving and eligible firms from receiving the contract and ensuing experience and business development that can result from such contracts. The 8(a) program is undermined, and indeed, the reputation of the 8(a) program and the public perception of it are harmed. *See* Dodds Affidavit, Exhibit A at ¶¶ 8-9.

In short, the 8(a) program has all of the hallmarks of a government benefits program: there are a series of concrete benefits available only to intended recipients who are deemed eligible for the program. Moreover, as with many government benefits programs, the 8(a) program is intended not only to help individual recipients, but also to benefit the United States economy by building deserving businesses that can serve as sources of economic strength for disadvantaged communities well after they graduate from the program. *See* Dodds Affidavit, Exhibit A at ¶¶ 3-4. Since MCC was not eligible to receive the benefits it obtained from the government during the course of the scheme and Far East did not, and affirmatively planned not to, fulfill its obligations under the 8(a) program, the Defendant and MCC were unintended recipients of the benefits they received from the 8(a) program. As such, consistent with Application Note 3(F)(ii), loss should be the value of the benefits obtained.

### iii.    *Case Law*

The D.C. Circuit has not addressed how loss should be calculated in a scheme such as the one orchestrated by the Defendant. A number of other Circuits have addressed this issue, though,

and they have concluded, consistent with the plain language of the relevant Application Notes, that loss equals the full value of the contracts.

The U.S. Court of Appeals for the Eleventh Circuit has held in two cases (one published and one unpublished) that programs designed to award government contracts to small and/or disadvantaged firms constitute government benefits programs under the Guidelines. As such, the loss amount in fraud cases involving such programs is the full contract price. *United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009); *United States v. Blanchet*, 518 Fed. Appx. 932 (11th Cir. 2013). In *Maxwell*, the court considered the appropriate loss amount following the defendant's conviction for fraud involving a local county small business enterprise ("CSBE") program and a U.S. Department of Transportation ("DOT") disadvantaged business enterprise ("DBE") program. 579 F.3d at 1305-07. At sentencing, the United States requested that the court find that the loss amount was the full $7.9 million of CSBE and DBE funds wrongfully awarded to the firm that was misrepresented as a CSBE/DBE. The sentencing court, however, found that the loss amount was six percent of that amount, which represented the estimated profit a true CSBE/DBE should have received in connection with the project, but did not receive because of the fraudulent scheme. *Id.* at 1305.

On appeal, the defendant challenged this loss amount calculation. The Court of Appeals held that the government benefits provision of the Guidelines applied to this situation. *Id.* at 1307. The court reasoned:

> [E]vidence was presented at Maxwell's trial that the primary purpose of the CSBE and DBE programs is to help small minority-owned businesses develop and grow, creating new jobs and helping to overcome the effects of past discrimination in the construction industry. *Unlike standard construction contracts, these contracts focus mainly on who is doing the work.* We are persuaded...that both the CSBE and DBE programs are

Government Benefits Programs under § 2B1.1 of the Sentencing Guidelines. Thus, *the appropriate amount of loss here should have been the entire value of the CSBE and DBE contracts that were diverted to the unintended recipient.*

The entire CSBE and DBE portions of the six MIA contracts were diverted to unintended recipients.... It is of no moment that [the recipient-entity] was a certified CSBE and DBE contractor; what matters is that [the entity] did not provide a commercially useful function on any of them. The proceeds of the six MIA contracts should have, but did not, go to a certified CSBE or DBE contractor that completed a commercially useful function.

*Id.* at 1306-07 (emphases added).[3]

In a later SBA case, the Eleventh Circuit adopted this same rationale. *Blanchet*, 518 Fed. Appx. 932. In that case, the defendants had engaged in a scheme to obtain a small business set-aside contract with the federal government by misrepresenting their company's affiliation with a larger, ineligible company. When considering the loss amount, the court noted that "Congress has declared that the government 'should aid, counsel, assist, and protect' small businesses to ensure that a fair portion of the government's total purchases and contracts for goods and services be placed with small business enterprises. 15 U.S.C. § 631(a)." *Id.* at 956. Relying on *Maxwell*, the court concluded: "[T]he amount of loss in cases involving government benefits programs equals the entire amount of the contract at issue.... As such,...the entire amount of the contract at issue – $100 million – [is attributable] to the Defendants as loss." *Id.* at 957.

The U.S. Court of Appeals for the Seventh Circuit has reached similar conclusions to the Eleventh Circuit, although on two separate theories. In *United States v. Giovenco*, the defendants' cable installation company had fraudulently obtained preferred status under Chicago's minority-

---

[3]       The United States did not cross-appeal the loss amount/sentencing issue in *Maxwell*, and for that reason, although the court found the district court had erred in determining loss, it did not remand this issue for re-determination. 579 F.3d at 1307.

23

owned business enterprise ("MBE") program.  773 F.3d 866 (7th Cir. 2014).  The trial court convicted the defendants and determined that the loss amount at issue was $8.3 million, or the full price of the contracts fraudulently obtained.  *Id.* at 870-71.  The court relied on Guidelines § 2B1.1, Application Note 3(F)(v).  *Id.* at 871.  That note provides that in cases where "goods for which regulatory approval by a government agency was required but was not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services, or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services."  The Court of Appeals affirmed the district court, and found that the conduct in the case was "squarely within the scheme considered by Application Note 3(F)(v)."  *Id.*

In *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006), the court similarly dealt with Chicago's MBE program, as well as its woman-owned business enterprise ("WBE") program.  In that case, the court convicted the defendants of fraud in obtaining MBE and WBE contracts, committed by falsely certifying that two companies were minority- and woman-owned.  464 F.3d at 779-81, 785.  The trial court sentenced the defendants based upon a loss amount equal to their profits on the contracts.  *Id.*  One defendant appealed his sentence, arguing that no loss was suffered at all.  *Id.* at 789-90.  The Court of Appeals held that the district court did commit error with regard to determining loss amount, but that the error was in failing to use the full price of the contracts as the loss amount under Guidelines § 2B1.1, and the government benefits Application Note thereto.  The court stated that the MBE and WBE programs were part of "an affirmative action program aimed at giving exclusive opportunities to certain women and minority businesses."  *Id.* at 790.  The court further found that the district court erred in reducing the loss by the value of services

rendered, and that "[t]he correct amount under the application note…is the value of the benefits diverted, which was over $100 million."[4]  *Id.*

The U.S. Court of Appeals for the Fourth Circuit has also held that in a contracting fraud case involving the DOT DBE program, the loss was the full amount "earmarked for DBE project participation." *See United States v. Bros. Const. Co. of Ohio, Inc.*, 219 F.3d 300, 318 (4th Cir. 2000).  In that case, the defendants had engaged in a scheme to obtain a $185,000 highway construction contract using a DBE that effectively lent its name to a non-DBE that actually did the work. *Id.* at 305-06.  Upon conviction for this fraud scheme, the defendant entities appealed their sentences, arguing that no loss should be attributed to their conduct. *Id.* at 317-318.  The court rejected their arguments, and found that the full DBE contract price was the loss amount.  *Id.* Notably, the defendants argued that not only was work performed under the contract, but the fraud scheme was eventually caught, and the project work was actually performed by, and the funds eventually did go to, a certified DBE.  *Id.*  Relying on the government benefits rule and the Guidelines emphasis on loss equaling the greater of actual or *intended* loss, the court concluded: "Despite the fact that the DBE goal was met, the funds were not put to the intended use – to compensate [the original DBE] for its work on the [project].  Moreover, [the defendants] conspired in a scheme that was intended to divert this money to . . . a non-DBE.…  These facts demonstrate a loss under § 2F1.1 [the predecessor to § 2B1.1] of the guidelines because *the conspiracy would have diverted the funds entirely from any DBE* but for the audit [which caught the fraud]." *Id.* at 318 (emphasis added).

---

[4]      As in *Maxwell*, however, the government did not cross appeal on this issue, and so the court in *Leahy* did not remand for the trial court to determine loss under its ruling that full contract price was the appropriate loss amount.  464 F.3d at 790.

Other U.S. Circuit Courts of Appeals have reached contrary conclusions to those discussed above, but the United States submits that the rationale in those cases should not apply here. In *United States v. Nagle*, 803 F.3d 167, 171 (3d Cir. 2015), the court considered the issue of the amount of loss where the defendant had engaged in a scheme in which a minority-owned business sought contracts as a DOT DBE. *Id.* In that case, when the DBE business won a contract, the defendant's non-DBE business would actually perform all of the work. *Id.* As in many other cases, the court concluded that the DBE program is a government benefits program under the Guidelines, and that as an initial matter, the loss amount was the full contract price. *Id.* at 181. The court went on, however, to conclude that the loss amount should be reduced by the value of services rendered. *Id.* at 182. The court relied on Guidelines § 2B1.1 Application Note 3(E)(i), which provides that "[l]oss shall be reduced by...the fair market value of...the services rendered by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." Although the United States argued that the non-DBE entity should not be regarded as providing any valuable services, the court rejected that argument, finding that "[a]lthough the DBE program cares about who performs the work, it also requires that the work be completed." The court also distinguished the above-discussed cases that have not reduced loss by the value of services provided, concluding that those cases were either decided prior to the existence of Application Note 3(E)(i) or failed to consider whether that note makes a difference. *Id.* at 182-83.

The Court should not apply *Nagle* to this case for, at least, four reasons: *First*, the conduct at issue in *Nagle* involved small-business fraud prior to 2008. As such, the presumption of loss in the 2010 Small Business Jobs Act was not in effect. On that basis alone, the Court here should

26

distinguish *Nagle* and find that it does not apply to a substantial number of the contracts awarded in connection with Defendant's scheme.

*Second*, *Nagle* involved a fraud perpetrated on the DOT DBE program and, while the goals of the DBE program are similar to the goals of the 8(a) program, the two programs operate in fundamentally different ways. As is noted above, the 8(a) program is a holistic program to which business organizations must be accepted. Acceptance to the program gives these businesses access to contracts for which they would not be eligible if they were not in the program. Additionally, a business can only participate in the program for nine years. The DOT DBE program, on the other hand, is designed to level the playing field and allow disadvantaged businesses to compete for federally funded transportation contracts that are open to all businesses.[5] Under that program, state and local authorities that receive DOT funds must set DBE contracting goals. No contracts are set aside specifically and solely for DBE firms, and DBEs do not have a limited program term for participation.

In light of the goals and operations of the 8(a) program, the harm done in fraudulently taking an 8(a) contract is distinct and substantial as compared to other programs such as the DOT DBE program: in 8(a) fraud, a business obtains access to a contract it is not eligible to receive. The business does not merely make some representations about its status in the course of obtaining a contract that it was otherwise eligible to obtain. Moreover, the harm to the true 8(a) companies is much more severe than it is to actual DBEs: unlike DBEs, 8(a) companies are term-limited.

---

[5] The discussion herein about the DBE and 8(a) programs is taken from the following: About the Disadvantaged Business Enterprise Program, available at *https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise*; History of the DBE Program, available at *https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise/history-dot-dbe-program*; and About the 8(a) Business Development Program, available at *https://www.sba.gov/content/about-8a-business-development-program*.

There are a finite number of contracts that will be bid during the time that an 8(a) company participates in the program. Every 8(a) contract obtained by fraud is an opportunity that is lost during the finite period of time that an 8(a) company is allowed to participate in the program.

*Third*, as many courts have held, when a non-disadvantaged entity fraudulently obtains a contract that was intended for a disadvantaged entity, the entire value of the contract does not go to its intended target. Accordingly, there should be no reduction for services provided under the wrongfully obtained contract. Application Note 3(E)(i) states that it applies to reduce loss by the value of services provided *to the victim*. In the case of 8(a) fraud, however, the victim is not only the government as the payer on the contract, but also the government's program as a whole, the legitimate disadvantaged businesses that were denied the contract, and society at large. When a defendant misappropriates a contract that was supposed to go to a disadvantaged business, the primary victims of that fraud do not receive anything of value from the defendant, and no reduction in loss should be allowed under Application Note 3(E)(i).[6]

*Fourth*, certain cases discussed above, which the court in *Nagle* summarily distinguished, actually did consider whether a reduction was appropriate when the defendant performed the services required under the fraudulently obtained contract. In each of those cases, the courts rejected any argument for reduction in loss. *See Blanchet*, 518 Fed. Appx. At 955 ("Despite the Defendants' argument that the government benefitted from the contract rather than losing from it,

---

[6]       Indeed, for these reasons, prior to *Nagle*, the U.S. Court of Appeals for the Third Circuit had concluded in an unpublished decision that loss was the full contract price in a DOT DBE case. *See United States v. Tulio*, 263 Fed. Appx. 258, 261 (3d Cir. 2008) (finding that the loss amount was the full price that was supposed to have been paid to a DBE, and, with regard to sufficiency of evidence and the defense claim that the government failed to establish the government was deprived of money, stating, "by showing Tulio's intention to induce [the government] to pay for a service it did not receive – work done by a certified DBE – there was sufficient evidence that the object of the alleged fraud and conspiracy was [government] money").

Congress has emphasized that there is a concern in ensuring that small businesses have a fair proportion of federal contracts because of the benefit that the nation receives from having a strong class of small businesses."); *Leahy*, 464 F.3d at 790 (finding that the district court erred when "it used the contract loss formula of 'contract price minus the benefit provided.'"); *Bros. Constr. Co.*, 219 F.3d at 318 (finding that the defendants' fraudulent intent to divert the full contract price to a non-DBE meant the loss was the full contract price, notwithstanding that the fraud was caught and the funds ultimately did go to a DBE). *See also Maxwell*, 579 F.3d at 1306-07 (finding that the loss amount was the full contract price, not the profit-margin on contract).

For these reasons, this Court should not apply *Nagle*.

In addition to the Third Circuit, the Ninth Circuit has also concluded that loss is something less than the full value of a contract. In *United States v. Martin*, 796 F.3d 1101 (9th Cir. 2015), the defendant fraudulently obtained SBA set-asides as well as DBE contracts. *Id.* at 1103-04. At sentencing, the defendant argued for a loss of zero because she had performed on the contracts, and the government argued for a loss amount equal to the full value of the contracts. *Id.* at 1104. The trial court then determined that the loss amount was the defendant's profit on the contracts. *Id.* On appeal, the court found that in applying rules of statutory construction, the government benefits rule of the Guidelines did not apply. *Id.* at 1109. Instead, the court applied the procurement fraud rule of Guidelines § 2B1.1, Application Note 3(A)(v)(II). That rule simply states that in procurement fraud cases, loss should take into account administrative costs to the government and other participants, plus any increased costs. The court noted that no administrative costs were identifiable, but that perhaps a premium was paid on the contracts at issue. *Id.* at 1110-11. The court stated that either the premium paid, or the defendant's gain,

should be used to measure loss. *Id.* at 1111. Finally, acknowledging the wide range of harm that defendants cause when fraudulently obtaining disadvantaged entity contracts, the court noted the rule of Guidelines § 2B1.1, Application Note 20(A), under which a court has the discretion to depart upwards if the sentencing range, as determined in part by the loss involved, does not accurately reflect the level of harm caused by the defendant. *Id.* at 1111-12.

As an initial matter, *Martin*, like *Nagle*, involved conduct that occurred before the statutory presumption in 15 U.S.C. § 632(w) was enacted and the court did not consider or reference this unambiguous legislation in its analysis. *See generally id. at 1101-12.* Moreover, *Martin* demonstrates the infeasibility and inaccuracy of using the procurement or gain rules of the Guidelines to determine loss in cases such as this. As the court all but acknowledged, doing so would ignore the actual harm done by the defendant's actions. *Id.* In *Martin*, the court speculated about the determinability of either the amount of premium paid, or gain received, and no conclusive evidence of either figure appeared on the record. *Id.* What is more, basing loss on those amounts could lead to improper or inaccurate results, and could have unintended consequences. For example, doing so would incentivize accounting tricks and further falsehoods and misrepresentations to avoid punishment for this harmful brand of fraud.

The Fifth Circuit followed *Martin's* rationale in *United States v. Harris*, 821 F.3d 589 (5th Cir. 2016). In *Harris*, the defendant was convicted of wire fraud in connection with a scheme to obtain government procurement contracts set aside by the SBA. At sentencing, the defendant challenged the sixteen level enhancement under Guidelines §2B1.1(b)(1), which encompassed the total loss amount from the two contracts at issue.

30

The Fifth Circuit determined that "procurement frauds involving contracts awarded under the 8(a) set-aside program, like procurement frauds generally, should be treated under the general rule for loss calculation, not the government benefits rule." *Id.* at 604. In support of its holding, the court argued that

> While a government contract awarded under an affirmative action program may be, in some sense, a "benefit" to the company awarded the contract, it does not share the common features of grants, loans, and entitlement program payments. Unlike the three enumerated examples, a contract award is not a unilateral transfer, but rather a bargained-for exchange for services rendered. And unlike the enumerated examples, contracts awarded under the 8(a) program do not exist primarily to benefit the awardee; rather, such contracts first and foremost serve the government's own procurement needs.

*Id.* at 603.

Importantly, the court in *Harris* – like the court in *Martin* – failed to consider the impact of the clear and unambiguous statutory presumption created by Congress and signed into law by the President – 15 U.S.C § 632(w). This failure causes the *Harris* courts' interpretation of the Guidelines to be inconsistent with the Small Business Jobs Act, and this court should not apply its reasoning.

Although the D.C. Circuit has not addressed this question, this District Court has recently considered the issue of loss amount in a case involving fraudulently obtained 8(a) contracts. *See United States v. Singh*, Crim No. 15-cr-00173-RBW (June 17, 2016). In *Singh*, the defendant procured over $8.5 million in 8(a) contracts that he had no right to obtain. Yet, the defendant argued at sentencing that the total loss was equal to the profit realized on the contracts, approximately $28,000. As it does here, the United States contended that the loss was the full value of the contracts. Under the case law and 15 U.S.C. § 632(w), Judge Walton expressly distinguished *Martin, Harris,* and *Nagle*. With regard to *Martin* and *Harris*, Judge Walton noted

that the "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Singh* at *10. Noting that *Martin* did not even consider the unambiguous language of 15 U.S.C. § 632(w), the Ninth Circuit's interpretation was inconsistent with the statute; therefore, "to the extent there are any discrepancies between the Guidelines and Congressional legislation – as would be the case if the Court were to follow *Martin's* analysis – it is the legislation that must ultimately prevail." *Id.* Judge Walton found *Harris* similarly unpersuasive as the Fifth Circuit also failed to consider the impact of the unambiguous statutory language. *Id.* at *11.

Judge Walton also distinguished the Third Circuit's decision in *Nagle*, since the state administered procurements at issue were neither administered by the SBA nor subject to 15 U.S.C. § 632(w)(1). *Id.* at *12. Therefore, the Third Circuit had no reason to consider the impact of the unambiguous statutory language. Judge Walton ultimately concluded that the "Court is persuaded by the reasoning adopted by the circuits that have interpreted the Guidelines' use of the term 'loss' in the defendant's circumstances as the total amount of the contract at issue. Interpreting the Guidelines otherwise would be inconsistent with the aforementioned provisions of the Small Business Jobs Act of 2010." *Id.*

The totality of Circuit authority weighs in favor of concluding, as Judge Walton has, that loss in an 8(a) or HUBZone fraud scheme should be the full value of the contracts awarded.

## SENTENCING RECOMMENDATION

In this case, the Defendant's conduct impacted important government programs designed to provide eligible, historically disadvantaged individuals with substantial government-contracting business and experience. The Defendant misappropriated over $1.6 million worth of contracts that were set aside for small, disadvantaged firms, thereby depriving legitimate businesses of the

32

opportunities they would have had to perform those contracts. The real and substantial loss resulting from the Defendant's actions is borne by the 8(a) and HUBZone programs, eligible 8(a) and HUBZone firms, and the value of the 8(a) and HUBZone programs to the public and U.S. economy. *See* Dodds Affidavit, Exhibit A at ¶¶ 7-10; 15.

However, the government acknowledges that a downward variance may be appropriate in this instance, and recommends that the Defendant be sentenced to 12 months and 1 day of probation, rather than a sentencing within the Guidelines range of 30 to 37 months. The United States also recommends that the Court impose as a condition of probation a term of home detention condition of at least 6 months. First, and most notably, similarly situated defendants in cases involving misappropriation of minority or disadvantaged business contracts generally receive sentences below the Guidelines range. Moreover, in this case, the Defendant was involved in the scheme for a relatively brief period, and he realized a relatively smaller amount of personal gain, as compared to defendants in the related cases. DPSR ¶¶ 54-56. A loss amount in this case equivalent to the Defendant's personal gain ($105,618) would have produced, after a reduction of 2 points for timely acceptance of responsibility, a Guidelines range of 10 to 16 months. In entering into the plea agreement in this case, the United States agreed to cap its allocution at 12 months and 1 day, which is within that range. Second, the Defendant not only agreed to enter a plea pre-indictment in this case, the Defendant was among the first of those involved to debrief with the government. The Defendant did not ultimately enter into a cooperation agreement, but his early debriefing with the government and overall cooperativeness likely contributed to other guilty pleas that the government was able to secure in this case.

33

For these reasons, and in light of the Defendant's criminal history and role in perpetrating the offense, we ask that the Court sentence the Defendant to 12 months and 1 day of probation, impose as a condition of probation a term of home detention of at least 6 months, impose a one-year period of supervised release, and a special assessment of $100, and order a forfeiture money judgment of $105,618.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY
D.C. Bar No. 415793

John Marston
DC Bar No. 493012
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C.  20530
(202) 252-6886
john.marston@usdoj.gov

LISA M. PHELAN
Chief, Washington Criminal I
Antitrust Division

Justin P. Murphy
Washington Criminal I, Antitrust Division
United States Department of Justice
450 Fifth Street, N.W., Suite 11300
Washington, D.C. 20530
(202) 598-8670
Justin.Murphy@usdoj.gov