# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16–cr–133 (KBJ) |
| | ) | |
| WALTER CRUMMY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The loss calculation that is required in Section 2B1.1(b)(1) of the Guidelines

Manual is often vigorously disputed, and this is so even in cases in which the parties

agree upon the ultimate sentence recommendation. *See* U.S. Sentencing Guidelines

("U.S.S.G.") §2B1.1(b)(1); *id.* §2B1.1 cmt. n.3. In the instant case, for example, both

the prosecution and the defense maintained that a probationary sentence was

appropriate for Defendant Walter Crummy, who illegally conspired with others to

obtain access to government contracts that his company was not entitled to receive

because the contracts were subject to certain "contracting preferences" that the Small

Business Administration administers. (Statement of Offense ("SOF"), ECF No. 6, at 6

(admitting to the fraudulent procurement of contracts that had been set aside for small,

disadvantaged businesses); *see* Gov't Mem. in Aid of Sentencing ("Gov't Mem."),

ECF No. 15, at 33 (recommending probation); Def.'s Mem. in Aid of Sentencing

("Def.'s Mem."), ECF No. 14, at 1 (same).)[1]  But the parties had radically different

positions as to the proper method of calculating the relevant loss in a case involving the

fraudulent procurement of set-aside contracts.  (*Compare* Gov't's Mem. at 17 ("[L]oss

[is] $1,631,377, which is the total price of the contracts misappropriated[.]"), *with*

Def.'s Mem. at 4 ("The loss amount in the PSR should be reduced by the value of the

services provided to the Government, which results in a loss amount of zero" because

both "contracts resulted in an actual loss to [Crummy's company]").)

On April 11, 2017, this Court sentenced Crummy to twelve months of probation,

following its resolution of the loss dispute, and in particular, its determination that the

credits-against-loss provision in section 2B1.1 Application Note 3(E)(i) applied to both

of the contracts at issue, and that the resulting total loss amount was zero under the

circumstances presented in this case.  This Memorandum Opinion explains the basis for

that conclusion.

I.      **BACKGROUND**

On August 23, 2016, Walter Crummy pled guilty to conspiracy to commit wire

fraud, in violation of Sections 371 and 1343 of Title 18 of the United States Code.  (*See*

Plea Agreement, ECF No. 5, at 1.)  According to the statement of offense filed in

connection with Crummy's guilty plea, Crummy and others conspired to perpetrate a

fraud that benefitted a company that Crummy partly owned—MCC Construction

Corporation ("MCC")—by improperly procuring certain restricted contracts from a

number of government agencies, including the Small Business Administration ("SBA")

and the United States Coast Guard.  (*See* SOF at 4–6.)  In essence, Crummy knowingly

---

[1] Page-number citations to documents the parties have filed refer to the page numbers that the Court's electronic filing system assigns.

and voluntarily joined a pre-existing scheme in which false representations were made so that MCC could obtain certain federal contracts that had been set aside for small, disadvantaged businesses under the SBA's Section 8(a) program. (*See id.* at 1, 5–6.)

A.     **The Basics Of The SBA's Section 8(a) Program**

The Section 8(a) program is a business development program designed to help small, disadvantaged businesses compete in the American economy and access the federal procurement market. *See Rothe Dev., Inc. v. DOD*, 107 F. Supp. 3d 183, 188 (D.D.C. 2015), *aff'd*, 836 F.3d 57 (D.C. Cir. 2016), *petition for cert. filed*, (U.S. April 13, 2017) (No. 16-1239). "Under the program, the SBA contracts to provide goods or services to other government agencies and then subcontracts performance of these contracts to eligible firms." *Minority Bus. Legal Def. & Educ. Fund, Inc. v. SBA*, 557 F. Supp. 37, 38 (D.D.C. 1982). Businesses that qualify for the Section 8(a) program are eligible for an award of both set-aside contracts (i.e., contracts awarded following competitive bidding among similarly eligible firms) or sole-source contracts (i.e., contracts awarded without competitive bidding) from participating government agencies. *See* 13 C.F.R. § 124.501(b).

In order to qualify for the Section 8(a) program, a business must, *inter alia*, be "a small business[,]" 13 C.F.R. § 124.101, and "must be at least 51 percent unconditionally and directly owned by one or more socially and economically disadvantaged individuals who are citizens of the United States," 13 C.F.R. § 124.105. In addition, an applicant must demonstrate both its ability "to perform contracts which may be awarded" pursuant to the program, and also its "reasonable prospects for success in competing in the private sector." 15 U.S.C. § 637(a)(7)(A). An applicant is

deemed to possess reasonable prospects for success competing in the private sector if it

has been "in business in its primary industry classification for at least two full years

immediately prior to the dates of its 8(a) BD application[,]" 13 C.F.R. § 124.107, or

must seek a waiver of this requirement by establishing, *inter alia*, "demonstrated

technical experience to carry out its business plan with substantial likelihood for

success[,]" "adequate capital to sustain its operations and carry out its business plan[,]"

and the fact that the individual "upon whom eligibility is based ha[s] substantial

business management experience[.]" 13 C.F.R. § 124.107(b)(1).

Significantly for present purposes, participants in the Section 8(a) program are

subject to strict regulatory limits on subcontracting the work that Section 8(a) set-aside

contracts require. *See* 13 C.F.R. § 125.6(a). Among other things, pursuant to SBA

regulations, a Section 8(a) participant must agree that it will use its own employees to

perform at least 15 percent of the cost of an awarded construction contract. *See* 13

C.F.R. § 125.6(a)(3).

### B. MCC's Fraudulent Procurement Of Section 8(a) Contracts

MCC Construction Company is a construction management company and general

contractor that provides a variety of building and renovation services. (*See* SOF at 4.)

MCC is not a Section 8(a) program participant, and thus, is ineligible for the

aforementioned SBA contracting preferences. (*See id.* at 6.) Nevertheless, in 2008,

MCC developed a business relationship with Company 1 (hereinafter referred to as

"C1")—a business that was "certified to participate in the 8(a) program" and that

purported to specialize in "design build services of energy and renewable programs" as

well as "general contracting and construction staffing services[.]" (*Id.* at 4.) It was

through this relationship that MCC was able to obtain government contracts that the

SBA intended to award to Section 8(a) program participants. (*See id.* at 6.)

The scheme to defraud was relatively straightforward. MCC and C1 entered into "teaming agreement[s]" in connection with a number of government contracts, pursuant to which C1 would (nominally) serve as the prime contractor, while MCC would act as the subcontractor. (*Id.* at 7.) Although the MCC/C1 teaming agreements were crafted on paper to comply with SBA rules and regulations (*see id.*), the two companies in fact implemented various "operating procedures that made [C1] nothing more than a pass through for the contracts [C1] subcontracted to MCC" (*id.* at 8). Indeed, Crummy and others acting on behalf of MCC exerted impermissible actual control over C1, concealed this control from the SBA, and facilitated the misrepresentation that C1 was in compliance with SBA regulations when it fact it was not. (*See id.* at 6.)

For example, Crummy "set up a bank account in the name of [C1]"—an account over which *both* MCC *and* C1 had joint signatory authority—and this account was used "to receive all payments from [C1's] government" contracts and to distribute any profits. (*Id.* at 8.) Moreover, on January 19, 2010, Crummy drafted an addendum to the profit-and-cost-reimbursement agreement that MCC and C1 had entered into; the addendum provided that C1 would award MCC a full 97 percent of the contract amount of any task order, and in exchange, MCC would provide all of the labor, equipment, and supervision needed to perform the task order. (*See id.* at 12–13.) Crummy took this action notwithstanding his knowledge that C1 would be violating the SBA's requirement that C1 perform at least 15 percent of the cost of the contract with its own employees. (*See id.* at 12, 13.) In addition, when interacting with the government on behalf of C1, Crummy used an email account that had C1's name in the address, and

that contained a signature block identifying Crummy as a C1 employee, despite the fact that Crummy was an officer and partial-owner of MCC. (*See id.* at 13−14.)

As relevant here, once Crummy knowingly and voluntarily joined the MCC/C1 contracting scheme, MCC obtained two government contracts through its improper control over C1: (1) the Coast Guard North contract, valued at $842,482; and (2) the Coast Guard South contract, valued at $788,895. (*See id.* at 14.) Consequently, Crummy's false and misleading conduct contributed to a total award of approximately $1,631,377 in Section 8(a) program contract funds to a non-Section 8(a) program participant. (*See id.* at 14.) MCC anticipated a 10-percent profit margin on these two contracts (i.e., $163,137); however, notably, MCC's anticipated profit never materialized, because ultimately "both contracts resulted in an actual loss to MCC." (*Id.* at 15.)

### C. Procedural History

Crummy was charged by information with one count of conspiracy to commit wire fraud wire on July 22, 2016 (*see* Information, ECF No. 1, at 1); he pled guilty to this one count on August 23, 2016 (*see* Plea Agreement at 1; Min. Entry of Aug. 23, 2016). Following the entry of Crummy's guilty plea, the parties submitted sentencing memoranda addressing the appropriate Guidelines range and sentence in this matter. (*See generally* Gov't's Mem.; Def.'s Mem.; Gov't's Reply Mem. in Aid of Sentencing ("Gov't's Reply"), ECF No. 16; Def.'s Resp. to Gov't's Mem. ("Def.'s Reply"), ECF No. 17.) The parties agreed that section 2B1.1(a)(2) of the Guidelines Manual provided a base offense level of six, but disagreed about the application of the loss table in section 2B1.1(b)(1), which provides for escalating offense-level increases depending on

the amount of pecuniary harm, in dollars, that resulted from the defendant's offense. (*See* Gov't's Mem. at 17–32; Def.'s Mem. at 3–10.)  *See also* U.S.S.G. §2B1.1(b)(1); *id.* §2B1.1 cmt. n.3(A)(i)–(ii) (defining actual or intended loss in relation to "pecuniary harm").

The crux of the parties' dispute centered on the question of whether the loss amount under section 2B1.1(b)(1) should reflect the *total* value of the two Coast Guard contracts at issue, or whether this amount should be reduced by the value of the services MCC provided to the government.  (*See* Gov't's Mem. at 17 (arguing that the loss "is the total price of the contracts misappropriated"); Def.'s Mem. at 4 (maintaining that "[t]he loss amount in the PSR should be reduced by the value of the services provided to the Government").)  This disagreement potentially implicated various application notes in the Guidelines Manual and, in essence, raised two questions:  (1) which Guidelines rule provides the appropriate baseline from which to measure loss in the first instance? and (2) does the credits-against-loss rule—which directs that loss be reduced by, *inter alia*, "the fair market value of the property returned and the services rendered[,]" U.S.S.G. §2B1.1 cmt. n.3(E)(i)—apply to that governing provision?

The government forcefully maintained in its memoranda and at the sentencing hearing that the special rule for "government benefits" applies to the loss calculation in this matter because "the government-administered [Section] 8(a) program provides a series of benefits to those business organizations that establish that they are intended recipients of benefits[.]"  (Gov't's Mem. at 20.)  In addition, with respect to the Coast Guard South contract, which was awarded after Congress's enactment of the Small Business Jobs Act of 2010, Pub. L. No. 111-240, 124 Stat. 2504 (2010) ("the SBJA"),

the government contended that there is "a statutory presumption that loss in such a scheme is equal to the full value of the contracts obtained." (Gov't's Mem. at 18 (citing 15 U.S.C. § 632(w)); *see also id.* at 19.) And with respect to the credits-against-loss rule, the government maintained that "there should be no reduction for services provided under the wrongfully obtained contract." (*Id.* at 28.) By contrast, Crummy asserted that the government benefits rule and the SBJA provision are both inapplicable (*see* Def.'s Mem. at 5–9), such that the general rule for loss calculation outlined in Application Note 3(A) governs this matter. Moreover, Crummy contended that, under any rule, the loss must be reduced by the fair market value of the services rendered to the government. (*See id.* at 4–10.)

During Crummy's sentencing hearing on April 11, 2017, this Court concluded that Crummy's position prevailed, because the Section 8(a) contracts at issue do not qualify as government benefits for the purpose of the loss calculation, and the credits-against-loss rule in Application Note 3(E) applies under these circumstances. Analyzing the facts of Crummy's case in light of that legal framework, the Court concluded that the appropriate loss amount was zero, and indicated that it would issue the instant Memorandum Opinion detailing its full reasoning regarding these loss calculation issues. (*See* April 11, 2017 Sentencing Hr'g Tr. ("Hr'g Tr."), ECF No. 24, at 33–36.)

## II. LEGAL STANDARDS

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range[,]" which the court then treats as "the starting point and the initial benchmark" for the sentence to be imposed. *Gall v. United*

*States*, 552 U.S. 38, 49 (2007).  "Then, 'after giving both parties an opportunity to argue for whatever sentence they deem appropriate,' the court considers all of the section 3553(a) sentencing factors and undertakes 'an individualized assessment based on the facts presented.'"  *United States v. Akhigbe*, 642 F.3d 1078, 1084 (D.C. Cir. 2011) (quoting *Gall*, 552 U.S. at 49–50).  When the Guidelines range is calculated, the "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  *Stinson v. United States*, 508 U.S. 36, 38 (1993).

Section 2B1.1 of the Guidelines Manual governs the calculation of the offense level for crimes involving, among other things, fraud, theft, and deceit.  *See* U.S.S.G. §2B1.1.  Subsection (a) provides the base offense level, while subsection (b) enumerates a list of adjustments for offense-specific characteristics.  The loss-based adjustment at issue here is located in subsection 2B1.1(b)(1), which provides a table of escalating offense-level increases based upon the total dollar loss resulting from the underlying offense.  *See, e.g.*, *id.* §2B1.1(b)(1) ("If the loss exceeded $6,500, increase the offense level as follows[.]").

Although section 2B1.1(b)(1) does not itself explain how the loss amount should be calculated, Application Note 3 provides rules that govern "the determination of loss under subsection (b)(1)."  *Id.* §2B1.1 cmt. n.3.  As a general rule, "loss is the greater of actual loss or intended loss[,]" *id.* §2B1.1 cmt. n.3(A), and both of these terms are defined as forms of "pecuniary harm"—that is, "harm that is monetary or that otherwise is readily measurable in money[,]" *id.* §2B1.1 cmt. n.3(A)(iii).  *See also id.* §2B1.1

cmt. n.3(A)(i) ("'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."); *id.* §2B1.1 cmt. n.3(A)(ii) ("'Intended loss . . . means the pecuniary harm that the defendant purposely sought to inflict[.]"). It is clear, then, that "the Guidelines define loss as 'pecuniary harm.'" *United States v. Martin*, 796 F.3d 1101, 1108 (9th Cir. 2015). In addition, "[t]he general rule contains a rule of construction that dictates how the general rule should be construed '[i]n the case of a procurement fraud, such as a fraud affecting a defense contract award.'" *United States v. Harris*, 821 F.3d 589, 603 (5th Cir. 2016) (second alteration in original) (quoting U.S.S.G. §2B1.1 cmt. n.3(A)(v)(II)); *see also* U.S.S.G. §2B1.1 cmt. n.3(a)(v)(II) ("In the case of a procurement fraud . . . reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other participants of repeating or correcting the procurement action affected," among other things).

Notwithstanding this general rule outlined in subdivision (A), the Application Note also provides a number of "special rules" that displace this general rule where applicable. *Id.* §2B1.1 cmt. n.3(F). One of these special rules applies in cases "involving government benefits (*e.g.*, grants, loans, entitlement program payments)[.]" *Id.* §2B1.1 cmt. n.3(F)(ii). In such cases, the Application Note specifies that "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses[.]" *Id.*

Finally, a different provision within the Application Note requires a court to afford certain credits against the total loss amount. *See id.* §2B1.1 cmt. n.3(E) ("Loss *shall* be reduced by the following[.]" (emphasis added)). As relevant here, this note provides that "loss shall be reduced by . . . the fair market value of the property

returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." *Id.* §2B1.1 cmt. n.3(E)(i).

The precise manner in which the foregoing application notes apply to defendants engaged in Section 8(a) (or a similar program) procurement fraud has been a source of disagreement among various circuits. *See, e.g.*, *Harris*, 821 F.3d at 604 ("Our sister circuits are split on whether the government benefits rule applies to procurement frauds involving contracts awarded under affirmative action programs."). However, the D.C. Circuit has yet to opine on this issue.

## III.  ANALYSIS

On April 11, 2017, this Court sentenced Crummy to twelve months of probation for his role in the Section 8(a) fraud conspiracy described above, after the Court concluded that the total loss amount for the purpose of section 2B1.1(b)(1) was zero because the credits-against-loss provision in Application Note 3(E) applied to both of the contracts at issue in this case. As explained below, the Court reached this conclusion (over the government's objection) because it believes the Fifth Circuit's recent reasoning regarding the appropriate loss calculation in Section 8(a) fraud cases is exceedingly persuasive, which means that the government's contention that Section 8(a) contracts are government benefits that are not subject to the credits-against-loss rule has to be rejected. Furthermore, in this Court's view, the statutory provision to which the government points—15 U.S.C. § 632(w)(1)—does little to alter the Fifth Circuit's cogent analysis, even assuming that provision applies at sentencing, because, at most, section 632(w)(1) merely establishes a presumption of the loss amount in the first instance, and it says nothing about whether that loss amount should be subject to the

credits-against-loss rule for the purpose of the actual loss calculation that section 2B1.1(b)(1) requires.

A. **The Loss That Results From The Fraudulent Procurement Of A Section 8(a) Contract Is Properly Calculated Pursuant To The General Rule Rather Than The Government Benefits Rule, And Is Also Subject To The Credits-Against-Loss Rule**

As noted, the D.C. Circuit has not addressed how loss should be calculated for the purpose of section 2B1.1(b)(1) when the offense of conviction is a procurement fraud scheme such as the one Crummy was convicted of conspiring to commit. However, a number of other circuits have addressed this issue, and the Fifth Circuit in particular has recently and persuasively concluded, first, that the government benefits rule does not apply to procurement frauds involving contracts awarded under the Section 8(a) program, and second, that the loss amount with respect to such contracting fraud cases must be reduced by the fair market value of the services rendered. *See Harris*, 821 F.3d at 602–03, 605. Both of these conclusions are well-founded and unassailable as a matter of law and logic.

With respect to the choice between the 'government benefits' special rule versus the 'general' loss rule, there is a clear distinction between the types of government benefits that the Sentencing Commission is addressing in the government benefits rule, *see* U.S.S.G. §2B1.1 cmt. n.3(F)(ii) (listing "grants, loans, [and] entitlement program payments" as examples of "government benefits"), and the Section 8(a) contracts at issue in this and other procurement fraud cases, as the Fifth Circuit rightly noted. *See Harris*, 821 F.3d at 603. In this regard, the *Harris* court emphatically rejected the government's contention that a contract secured pursuant to the Section 8(a) program constitutes a "government benefit" for the purpose of Application Note 3(F)(ii),

explaining that "[w]hile a government contract awarded under an affirmative action program may be, in some sense, a 'benefit' to the company awarded the contract, it does not share the common features of grants, loans, and entitlement program payments." *Id.*; *see also id.* at 604 ("The mere fact that a government contract furthers some public policy objective apart from the government's procurement needs is not enough to transform the contract into a 'government benefit' akin to a grant or an entitlement program payment.").

Furthermore, insofar as fraudulent procurement of a Section 8(a) program contract is functionally indistinguishable from other types of procurement fraud, it is clear to this Court (as it was to the Fifth Circuit) that the credits-against-loss rule applies in these circumstances, such that the loss amount is not the total contract price, but the contract price less the fair market value of the services that the defendant rendered. *See id.* at 605–08; *see also id.* at 605 ("[T]he Sentencing Commission speaks clearly when it wants to exempt specific types of cases from the default practice of crediting against loss the value of services rendered by the defendant." (citing U.S.S.G. §2B1.1 cmt. n.3(F)(v))). To conclude otherwise would be to ignore the fact that the Commission defines "actual loss" for section 2B1.1(b)(1) purposes as the "reasonably foreseeable *pecuniary* harm that resulted from the offense," U.S.S.G. §2B1.1 cmt. n.3(a)(i) (emphasis added), and accordingly, "[t]reating the loss amount under these circumstances as the difference between the contract price and the fair market value of services provided properly focuses the loss inquiry on the pecuniary impact on victims[.]" *Harris*, 821 F.3d at 606. *Harris* also rightly reasons that, without the reduction for the value of the services rendered, section 2B1.1 would operate to treat

theft and fraud as equivalents as far as loss to the victim is concerned, which is not always the case, and is certainly not so with respect to the type of fraud at issue here. *See id.* at 607 (observing that applying the credits-against-loss rule when determining the actual loss for Section 8(a) fraud "'is consistent with the idea that fraud is not always the same as theft'" (quoting *Martin*, 796 F.3d at 1108)).

This Court need not recite the *Harris* court's reasoning further; at this point, it suffices to note that this Court finds the Fifth Circuit's reasoning on these issues persuasive in its entirety, and thus, the Court likewise concludes that both the general rule and the credits-against-loss provision apply to contracts that, like Crummy's, were awarded under the Section 8(a) program. *See also Martin*, 796 F.3d at 1109–10; *cf. United States v. Nagle*, 803 F.3d 167, 181–83 (3d Cir. 2015) (declining to decide whether the government benefits rule applies to affirmative action contracting programs, but concluding that, "regardless of which application note is used, the District Court should calculate the amount of loss" by "taking the face value of the contracts and subtracting the fair market value of the services rendered under those contracts").[2]

---

[2] The government points out that other circuits have concluded under similar circumstances that the loss amount is equal to the full amount of the fraudulently-obtained contracts. (*See* Gov't's Mem. at 22–25 (citing, *inter alia*, *United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009); *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006); *United States v. Bros. Constr. Co. of Ohio*, 219 F.3d 300 (4th Cir. 2000)).) However, two of these cases were decided using a version of the Guidelines that *did not contain* any language requiring that loss be reduced by the fair market value of the services rendered. *See Bros. Constr. Co.*, 219 F.3d at 316–17 (applying 1997 Guidelines); *Leahy*, 464 F.3d at 789 (applying 1998 Guidelines). Thus, neither the Fourth nor Seventh Circuits had occasion to consider the impact of Application Note 3(E)(i). What is more, although the Eleventh Circuit concluded that contracting-preference programs constitute "entitlement program payments" because they are "aimed at giving exclusive opportunities to certain women and minority businesses,'" *Maxwell*, 579 F.3d at 1306 (citation omitted), "that court merely relied on *Leahy* and *Brothers Construction* and did not consider whether Note 3(E)(i) made a difference in the analysis." *Nagle*, 803 F.3d at 182. Thus, this Court is most persuaded by the Fifth Circuit's recent and cogent analysis of the relevant provisions of the Guidelines Manual.

**B. The Court Rejects The Suggestion That Its Refusal To Calculate Loss As The Full Amount Of The Section 8(a) Contracts Is Inconsistent With The Guidelines Or Otherwise Conceptually Problematic**

In its sentencing memorandum, the government emphasized that the Section 8(a) fraud scheme at issue in this case resulted in the "misappropriat[ion] [of] over $1.6 million worth of contracts that were set aside for small, disadvantaged firms," (Gov't's Mem. at 32), thereby "undermin[ing]" the "reputation of the 8(a) program and the public perception of it[,]" and "preventing deserving and eligible firms from receiving the contract[s]" (*id.* at 21). No one denies that the procurement fraud that Crummy and his co-conspirators engaged in resulted in real harm to the government and to other potential recipients of the contracts at issue, nor do the Guidelines ignore that harm when they are properly construed. Rather, the Guidelines appropriately relegate this type of injury—i.e., the harm to the government's programmatic interests, which is undoubtedly *non*-pecuniary harm—to its appropriate classification, and various Guidelines provisions specifically prescribe methods to account for the nature and extent of such non-pecuniary harm.

For example, in "cases in which the offense level determined under [section 2B1.1] substantially understates the seriousness of the offense[,]" because, *inter alia*, an offense "caused or risked substantial non-monetary harm[,]" the commentary to section 2B1.1 specifically notes that an upward departure may be warranted. U.S.S.G. §2B1.1 cmt. n.20(A)(ii). Similarly, to the extent that the offense level does not reflect the full extent of the harm suffered, a court may depart on that basis alone, *see id.* §5K2.0(a), and would be justified in so doing on the basis of factors that section 2B1.1 does not appear to take into account, such as the number of contracts the defendant fraudulently obtained, or the length of time during which the defendant participated in

the scheme.  *Cf. United States v. Nawaz*, 555 F. App'x 19, 30 (2d Cir. 2014) (noting

that the district court reduced the applicable Guidelines range in light of, *inter alia*,

"the duration of [the defendant's] involvement in the conspiracy").  The Guidelines thus

provide alternative mechanisms to account for much of the non-pecuniary harm that the

government emphasizes, and unlike the government's insistence that the entire value of

a fraudulently-obtained Section 8(a) contract is its loss, these alternative methods are

consistent with the Commission's directive that the only loss considered under section

2B1.1(b)(1) is loss that "is monetary or that otherwise is readily measureable in

money."  U.S.S.G. §2B1.1 cmt. n.3(A)(iii).

It is also important to debunk the mistaken belief that the credits-against-loss

rule should not be deemed applicable in these kinds of fraud cases because, if that rule

is applied, the loss amount for section 2B1.1(b)(1) purposes will *always* be zero, no

matter how extensive the fraud.  This is simply not so.  Courts have recognized that

"[i]t is conceivable that the government paid a premium contract price above what it

would pay for other contracts under normal competitive bidding procedures[,]" and that

"[a]ny such difference would be an actual loss resulting from [the] fraud."  *Martin*, 796

F.3d at 1111; *see also Harris*, 821 F.3d at 605 n.10.  In addition, "the procurement

fraud rule, which falls within the general rule for loss calculation," *Martin*, 796 F.3d at

1110−11, specifies that loss "[i]n the case of a procurement fraud" also includes

"reasonably foreseeable administrative costs" to correct the procurement action

affected, U.S.S.G. §2B1.1 cmt. n.3(A)(v)(II).  Notably, and perhaps unfortunately, there

is no evidence in the instant matter of any of these types of losses, but the Guidelines

and various precedents do clearly indicate that there can be pecuniary loss under these

circumstances, and therefore, the loss amount need not always be zero once it is reduced by the value of the services rendered in Section 8(a) procurement fraud cases.

Finally, even when the loss amount is zero and there is no basis for any upward departure or variance, it is not necessarily troubling that the loss amount in cases such as this one is not the entire amount of the Section 8(a) contract; after all, a defendant who commits procurement fraud of this nature (i.e., one who steers Section 8(a) contracts to a non-section 8(a) business on fraudulent terms) has committed a federal offense and on that basis alone is subject to a range of at least 0-to-6 months of imprisonment under the Guidelines. *See id.* §2B1.1(a)(2) (prescribing a minimum base offense level of six, which corresponds to a range of 0–6 months for an offender in Criminal History Category I). Put another way, sections 2B1.1(a) and 2B1.1(b)(1) plainly perform different functions in the Guidelines calculus: the court applies section 2B1.1(a) in response to the defendant's admittedly *fraudulent conduct*, but the sole question under section 2B1.1(b)(1) is whether the defendant's fraudulent conduct resulted in *pecuniary loss* warranting a further increase in his base offense level. And as the Guidelines make clear, to identify the actual pecuniary loss to a victim under section 2B1.1(b)(1), the Court must subtract from the total contract price the value of the services that the defendant rendered. *See id.* §2B1.1 cmt. n.3(E)(i).

In short, the record establishes (and the government concedes) that *it was MCC* that suffered a pecuniary loss on both of the Coast Guard contracts at issue here, and there is no evidence before the Court that would allow it to compare the fair market value of the services that MCC provided on the contracts to the contract price. Furthermore, the government has not itemized its administrative costs, nor has it argued

that an upward departure or variance is warranted to capture the full extent of the non-pecuniary harm done to the integrity of the Section 8(a) program in this and similar cases. Thus, this Court finds that the loss amount in this matter for the purpose of section 2B1.1(b)(1) is zero, and thus, with respect to the loss table, there is no basis for increasing Crummy's base offense level above six.

C. **Even Assuming That 15 U.S.C. § 632(w)(1) Applies Under These Circumstances, That Statute Does Not Alter The Foregoing Analysis Because Its Text Is Consistent With Applying The Credits-Against-Loss Rule**

The government insists that the foregoing analysis is erroneous (at least with respect to the Coast Guard South contract, which was awarded following the passage of the Small Business Jobs Act (*see* Gov't's Mem. at 19)) because Congress created "a statutory presumption" that "loss" in a small-business-fraud scheme "is equal to the full value of the contracts obtained" (*id.* at 18 (citing 15 U.S.C. § 632(w)). While that may be so, it is not at all clear that Congress intended for this presumption to supplant aspects of the Guideline calculation that the Commission has determined otherwise apply to yield the total loss amount.

Section 632(w)(1) of Title 15 of the United States Code provides:

> In every contract, subcontract, cooperative agreement, cooperative research and development agreement, or grant which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a presumption of loss to the United States based on the total amount expended . . . whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation.

15 U.S.C. § 632(w)(1).[3] As the government observes, the text of this provision plainly

---

[3] The parties here dispute the extent to which this statutory provision applies to the sentencing of a defendant convicted of fraud. (*Compare* Gov't's Mem. at 18–19 ("The [Senate] Committee also stated that it intended 'that this presumption shall be applied in all manner of criminal, civil, administrative,

18

establishes a presumption of "loss" based on the total amount expended on a contract or other award whenever a non-small business receives by misrepresentation a contract or other award that is intended for a small business. What the provision does *not* do, however, is mandate that the sentencing judge ignore the Commission's clear command that "[l]oss *shall be reduced* by . . . [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant[.]" U.S.S.G. §2B1.1 cmt. n.3(E)(i) (emphasis added). Thus, it is clear to this Court that, at most, section 632(w)(1) is best interpreted as setting the relevant baseline for the loss calculation in Section 8(a) contract fraud cases, and when interpreted in this manner, the statute is entirely consistent with the default practice of treating pecuniary harm as the difference between the contract price and the fair market value of the services rendered.

To understand why this is so, recall that the Guidelines broadly provide a two-step framework for calculating the loss amount for section 2B1.1(b)(1) purposes, as explained above: first, the application notes outline various rules of construction to assist courts in defining "loss[,]" and second, the notes provide that the "loss shall be reduced by" certain factors, including the fair market value of the services rendered. U.S.S.G. §2B1.1 cmt. n.3(E)(i). In this Court's view, rather than fundamentally altering this framework, section 632(w)(1) fits comfortably within it, because the provision provides an initial reference point insofar as it clarifies that the loss in the

---

contractual, common law, or other actions, which the United States government may take to redress such fraud and misrepresentation.'" (quoting S. Rep. No. 111-343 at 8 (2010))), *with* Def.'s Mem. at 9 ("§ 632(w)(1) is not about sentencing at all.").) This Court will assume without deciding that this provision is applicable under the circumstances presented here because, as explained below, even assuming that the statute establishes the presumptive loss amount, the Court finds that this loss amount would still have to be reduced by the value of the services rendered to the government.

first instance is (presumptively) the total amount expended on the contract. Notably, the statute says nothing about whether this initial presumptive loss amount should be, or can be, *reduced* pursuant to the credits-against-loss rule or otherwise, and there is nothing to suggest that Congress intended to alter the standard practice of crediting the value of the services rendered when the court determines the actual loss to a victim in a procurement fraud case. Nor has the government pointed to anything in the text or history of section 632(w)(1) that indicates that Congress intended the provision to supplant the operation of the default credits-against-loss rule when it passed the SBJA in 2010.

Significantly, interpreting section 632(w)(1) to permit a reduction in total loss based on the value of the services rendered also makes eminent sense where, as here, it is difficult to conceive of the government's true pecuniary loss as the *entire* amount of a Section 8(a) contract. *Cf. Martin*, 796 F.3d at 1110 ("By fully performing all of the contracts, Martin gave the government considerable value. It would be unjust to set the loss resulting from her fraud as the entire value of the contracts[.]"). Thus, this Court finds that the best reading of all of the provisions at issue is to view the statute as setting the baseline loss amount from which the remaining loss-related directives in the Guidelines operate. In the Court's view, this is the only reading that is consistent with the statutory and Guideline text, as well as the overall purpose of the Guideline calculation at issue, which is to determine the pecuniary harm to the victims that resulted from the defendant's fraudulent behavior.

To the extent that *United States v. Singh*, 195 F. Supp. 3d 25 (D.D.C. 2016), says otherwise (*see* Gov't's Mem. at 31–32), the undersigned respectfully disagrees with

*Singh*'s analysis and conclusion. In that case, the parties disputed the total loss amount

stemming from the defendant's fraudulent procurement of several Section 8(a) program

contracts, and the court concluded that "the amount of loss that must be used in

calculating the defendant's guidelines is the full amount of the contracts that the

defendant fraudulently procured[.]" *Singh*, 195 F. Supp. 3d at 27; *see also id.* at 26–28.

The *Singh* court drew upon decisions from the Fourth, Seventh, and Eleventh Circuits,

and not only determined that the government benefits rule applies to fraud in

connection with Section 8(a) contracting programs, but further noted that this reading

"comports with the unambiguous intentions of Congress as articulated in the Small

Business Jobs Act of 2010[.]" *Singh*, 195 F. Supp. 3d at 29–30. In this regard, the

*Singh* court interpreted section 632(w)(1) as establishing a presumption of loss, and

found that "the *only* permissible means by which the presumption of loss may be

rebutted would be through the introduction of evidence establishing" "'unintentional

errors, technical malfunctions, [or] other similar situations that demonstrate that a

misrepresentation of size was not affirmative, intentional, willful[,] or actionable under

the False Claims Act[.]'" *Id.* at 30, 31 (emphasis and second alteration in original in

original) (quoting 13 C.F.R. § 108(d)).

The undersigned is persuaded that Section 8(a) program contracts are not

properly considered "government benefits" for the purpose of the loss calculation, as

explained fully above, *see supra* Part II.A, although this Court acknowledges that the

circuits are currently divided on this question. *Compare Bros. Constr. Co.*, 219 F.3d at

317–18, *and Leahy*, 464 F.3d at 789–90, *and Maxwell*, 579 F.3d at 1305–07, *with*

*Harris*, 821 F.3d at 602–03, *and Martin*, 796 F.3d at 1110; *see also supra* note 2.

Moreover, with respect to the impact of the statute, it appears that *Singh* was primarily concerned about the manner in which the statutory presumption may be *rebutted*, while, in this Court's view, the manner in which the presumptive loss amount may be rebutted is analytically distinct from the question of whether the credits-against-loss provision in Application Note 3(E)(i) applies. That is, regardless of whether the loss is set at the presumptive amount that Congress has identified or some other amount, the sentencing judge must still consider whether and to what extent the loss must be "reduced" as the application notes require. *See* U.S.S.G. §2B1.1 cmt. n.3(E)(i). *Singh* makes only passing reference to the credits-against-loss rule, *see* 195 F. Supp. 3d at 28, 33, and does not expressly consider the extent to which this provision might operate in conjunction with the statutory presumption (whether rebutted or not). Because this Court believes that the statutory presumption does not displace the credits-against-loss rule, it finds the *Singh* court's conclusion that loss is the entire amount of the contract unpersuasive.[4]

## IV.    CONCLUSION

For the reasons explained above, the Section 8(a) contracts at issue in this case (1) do not qualify as government benefits for the purposes of loss calculation, and (2) are subject to the credits-against-loss provision. *See Harris*, 821 F.3d at 602–03, 605. In addition, this Court concludes that 15 U.S.C. § 632(w)(1) does not materially alter this Guidelines analysis, since nothing in that statute indicates that the presumptive loss amount should *not* be offset by the fair market value of the property returned and the services rendered. *See* U.S.S.G. §2B1.1 cmt. n.3(E)(i) (providing that loss be reduced

---

[4] This Court takes no position on *Singh*'s conclusion regarding the circumstances in which the statutory presumption that 15 U.S.C. § 632(w)(1) establishes may be rebutted. *See Singh*, 195 F. Supp. 3d at 31.

by "the fair market value of . . . the services rendered, by the defendant or other persons acting jointly with the defendant").

This all means that the Court rejects the government's argument that the loss amount in Crummy's case is equal to the total amount of the Section 8(a) contracts, and given that MCC made no profit on the Coast Guard contracts, the Court concludes that the total pecuniary loss to the government resulting from Crummy's procurement fraud was zero. Therefore, as explained during Crummy's sentencing hearing, the applicable Guidelines range for the offense at issue in this case (after the deduction for acceptance of responsibility) is zero to six months.[5]


DATE: April 20, 2017                *Ketanji Brown Jackson*
                                    KETANJI BROWN JACKSON
                                    United States District Judge

---

[5] Pursuant to section 2B1.1, Crummy's base offense level was six, *see* U.S.S.G. §2B1.1(a)(2), and Crummy received no loss-based increase pursuant to section 2B1.1(b)(1) because the total loss amount resulting from his conduct was zero, *see id.* §2B1.1(b)(1). Following a two-point deduction for acceptance of responsibility, *see id.* §3E1.1(a), Crummy's total offense level was four. In addition, the parties agreed that Crummy had a criminal history category of I. Pursuant to the Sentencing Table, a criminal history category of I and an adjusted offense level of four result in a Guidelines range of zero to six months.